Case: 18-3389    Document 1-1    Filed: 11/07/2018    Pages: 102

SHORT RECORD
NO. 18-3389
FILED 11/7/18

IN THE
UNITED STATES COURT
OF APPEALS FOR THE
SEVENTH CIRCUIT

---

IN RE: SHERMAN LAMONT FIELDS

PETITIONER.

On Petition for a writ of Mandamus
to the Seventh Circuit Court of Appeals.

---

PETITION FOR A WRIT OF MANDAMUS

PETITION FOR A WRIT OF ACTUAL INNOCENCE

CAPITAL CASE
(DEATH PENALTY)

EMERGENCY PETITION!

U.S.C.A. — 7th Circuit
RECEIVED
NOV 07 2018  DL
GINO J. AGNELLO
CLERK

Sherman Lamont Fields
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, Indiana
                47808
                Pro Se

## QUESTION(S) PRESENTED

Can the Court(s) force Counsel on a Pro Se Defendant?

And Can the Court(s) force counsel on a Pro Se Defendant in a situation like this?

### ALSO

WHEN THE EVIDENCE PROVES THAT A DEFENDANT IS ACTUALLY INNOCENT IS IT UNCONSTITUTIONAL TO MAKE THE DEFENDANT WAIT  FOR RELEASE WHEN RELEASE SHOULD BE IMMEDIATE?

i

INTERESTED PARTIE(S)

RESPONDENT(S)

Zachary C. Richter
Special Assistant U.S. Attorney
816 Congress Ave., Suite 1000
Austin, Texas 78701
(512) 916-5858
zacharyc.richter@usdoj.gov


James R. Wood
Assistant U.S. Attorney
10 W. Market St., Suite 2100
Indianapolis, Indiana 46204-3048
(317) 226-6333
Bob.wood@usdoj.gov


ATTORNEY(S) FOR PLAINTIFF

Jeffrey E. Ellis
Oregon Capital Resource Center
621 SW Morrison St.
Suite 1025
Portland, OR 97205
(206) 218-7076
jeffreyerwinellis@gmail.com


Peter J. Isajiw
King & Spaulding LLP
1185 Avenue of the Americas
New York, NY 10036
212 556-2235
Fax: 212-556-2222
pisajiw@kslaw.com


DISTRICT JUDGE

The Honorable Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana
105 U.S. Courthouse
46 East Ohio Street
Indianapolis, Indiana  46204

# TABLE OF CONTENTS

QUESTION(S) PRESENTED........................i

INTERESTED PARTIE(S).........................ii

TABLE OF CONTENTS............................iii

TABLE OF AUTHORITIES.........................iv

JURISDICTION.................................1

CONSTITUTIONAL PROVISIONS/STATUTES AND RULES...1

STATEMENT....................................2-6

REASON(S) FOR GRANTING THE PETITION..........6

I. This Court should Grant this " Extraordinary Writ " because Under the Law Fields have a Right not to have Counsel forced upon him...........6-7

II. This Court Should Grand this " Extraordinary Writ " because Petitioner Fields is Actually Innocent of Murder and " Carjacking "...............7-13

III. A WRIT OF MANDAMUS IS APPROPRIATE...........13-14

CONCLUSION...................................14-15

TABLE OF AUTHORITIES

Cases

Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir.)........................13
Brady y. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed .2d 215 (1963).4
Chamberlain v. Ericksen, 744 F.2d 628, 630 (8th Cir. 1984), cert.
                    denied, 470 U.S. 1008, 84 L.Ed .2d 387, 105
                    S.Ct. 1368 (1985)............................ 6
Chandler v. Crosby, 379 F.3d 1278, 1288 (11th Cir. 2004)..............13
Cheney v. U.S. District Court, 542 U.S. 367, 380 (2004)............... 13-14
De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 217(1945). 13
Duest v. Singletary, 967 F.2d 472, 482, (11th Cir. 1992), vacated on
                    other grounds, 507 U.S. 113 S.Ct. 1940, 123 L.ED
                    .2d 647 (1993)....................................12
Estelle v. Gamble, 429 U.S. 97, 102-103, 97 S.Ct. 285, 290, 50 L.Ed
                    .2d 251 (1976)....................................13
Fields v. Warden USP Terre Haute, 2:16-cv-418-JMS-MJD..................3-13
Gardens v. Stephens, Sup. Ct. #13-546 (2013) cert. pending, 5th Cir.
                    (8/2/13)...............12
In Re Davis, No. CV-409-130 (8/24/10).................................12
In Re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed 519...............13
Johnson v. United States, 135 S.Ct. 2552-2557-58(2015)..................3
Kuhlman v. Wilson, 477 U.S. at 454 & n.17, 106 S.Ct. at 2627 & n. 17...12
Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 863-864
                    108 S.Ct. 2194, 100 L.Ed .2d 855.............. 1
Mooney v. Holohan, 294 U.S. 103, 113 (1935)........................... 12
Napue v. Illinois, 360 U.S. 264, 209, 3 L.Ed. 2d 1217, 79 S.Ct.
                    1173 (1959).............4
Price v. Johnson, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed 1356 (1948)....6
Schlup v. Delo, 513 U.S. 298, 314-16, 130 L.Ed .2d 808, 115 S.Ct. 851 (1995). ....12
Sessions v. Dimaya, 138 S.Ct. 1204 (2018)............................
U.S. Alkali Export Ass'n v. U.S., 325 U.S. 196, 201-02(1945).........13

STATUTES

28 U.S.C. § 1651.................1-13

RULES

SUP. CT. R. 20.1................13

## JURISDICTION

The Jurisdiction of this Court is invoked under
28 U.S.C. § 1651

This Court may grant an extraordinary writ as long as " extraordinary circumstances " exist.

" Determining whether " extraordinary circumstances " are present may include consideration of a wide range of factors, including " the risk of injustice to the parties " and " the risk of undermining the public's confidence in the judicial process." Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 863-864, 108 S.Ct. 2194, 100 L.Ed .2d 855. "

## CONSTITUTIONAL PROVISION(S) INVOLVED

THE FIFTH AMENDMENT to the United States Constitution provides that " [N]o person shall be deprived of Life, Liberty, or property, without Due process of law."

THE FOURTEENTH AMENDMENT to the United States Constitution provides  that [N]o State shall...deprive any person of Life, Liberty, or property without Due Process of law."

THE EIGHTH AMENDMENT to the United States Constitution provides that " Excessive bail shall not be required, nor Cruel and Unusual Punishments inflicted."

1

## STATEMENT OF THE CASE

Petitioner Sherman Lamont Fields was convicted and sentenced to death for Escape, Conspiracy, Using and carrying a firearm causing death, Carjacking, Using and carrying a firearm during the commission of a crime of violence; Escape, Using and carrying a firearm during the commission of a crime of violence; Carjacking, and Felon in possession of a firearm. After the Fifth Circuit Unconstitutionally denied Direct Appeal and then subsequently Unconstitutionally denied Petitioner a C.O.A. with no regards for Fields' innocence, and didn't even allow Petitioner a chance to present the evidence of his innocence the Supreme Court asked Petitioner " Why can't he file in the district of Incarceration?" Petitioner then sought leave to file a successive 28 U.S.C. § 2241 Motion in the U.S. District Court for the Southern District of Indiana ( District of Incarceration ) as a Pro Se Defendant, in light of his Actual Innocence. Petitioner also filed a Writ of error coram nobis/Writ of conspiracy. In all Petitioner filed nine issues:

A). Fields was denied his Constitutional Right to file a Pro Se brief and Motions.

B). The safegurds put in place in Greg v Georgia and its progency failed to protect Fields from Judicial Bias at trial and on appeal.

C). The 5th Circuit's refusal to accept Fields' timely Pro Se Brief and Motions allowed the Prosecutions violation of Brady v. Maryland to go unadjudicated; And the safeguards put in place in Greg v. Georgia and its progency failed to protect Fields from the prosecution's violation of Brady.

D). Minus the Constitutional violations Fields is Actually Innocent, and failure to entertain Fields' petition would result in a gross miscarriage of justice.

E). The safeguards put in place in Greg v. Georgia and its progency failed to protect Fields from criminal act(s) perpetrated against him by the United States Government.

F). The safeguards put in place in Greg v. Georgia and its progency failed to protect Fields from Fraud on the Court.

G). The safeguards put in place in Greg v. Georgia and its progency failed to protect Fields against a wrongful conviction and death sentence influenced by passion, prejudice and/or other arbitrary factors.

H). The Antiterrorism and Effective Death Penalty Act is Illegal and Unconstitutional.

I). The Death Penalty is Illegal and Unconstitutional.

The District Judge authorized Sherman Lamont Fields v. Warden USP Terre Haute and assigned Case No. 2:16-cv-418-JMS-MJD and ordered the government to respond to the § 2241 but dismissed the Writ of error coram nobis/Writ of conspiracy as being " premature ".

While awaiting the governments response, and unbeknownst to Petitioner Fields his Court appointed § 2255 Attorney Jeffrey Ellis filed with the District Court to attach to Petitioner's § 2241 and filed a supplementary brief pursuant to Johnson v. U.S., 135 S.Ct. 2552, 2557-58(2015) stating that Johnson invalidates 18 USC § 924(c) and Petitioner's Death Sentence and " carjacking."

Petitioner objected to Counsel's attachment because (A). Fields, in his Pro Se § 2241 presented forensics reports proving that he is Actually innocent of Murder and carjacking, thus against the backdrop of his Actual Innocence the " Johnson Issue " is irrelevant; And (B). Fields wanted his Actual Innocence to remain front and center and didn't want " Johnson " to distort the issues. Also it appears to be a conflict of interest when the Petitioner is pushing Actual Innocence, then an attorney comes in and places a " Johnson Issue " front and center.

On or about May 30, 2017 Petitioner had a telephonic conference with Attorney Jeff Ellis and District Judge Jane Magnus-Stinson where Petitioner objected to Counsel's attachment. The Judge heard Fields out and said that she would issue a ruling in the days to come.

On May 31, 2017 Judge Magnus-Stinson issued an order that Petitioner cannot " file material directly with the Court." ( See App.1 )

The Government responded to Fields' § 2241 and Mr. Ellis' " Johnson issue " arguing that the AEDPA bars petitioner(s) from proceeding via § 2241 but inadvertently admits that they did indeed

3

violate Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.ED .2d 215 (1963) and Napue v. Illinois, 360 U.S. 264, 269, 3L.ED .2d 1217, 79 S.Ct. 1173 (1959) in order to effectuate Fields' conviction(s) and Death sentence; The government further advised that if the Court don't dismiss the petition the Court should Stay the ruling until the Supreme Court rule on Sessions v. Dimaya, 138 S.Ct. 1204 (2018).

Judge Magnus-Stinson Stayed the proceedings as the government asked affirming Fields fears that " Johnson " would distort\ his Actual Innocence.

When the Supreme Court ruled on Dimaya Judge Magnus-Stinson gave Attorney  Jeff Ellis and the prosecution " a window " to " make a deal." ( See App. 2   ).

Attorney Jeff Ellis and Peter Isajiw caught a flight to Austin, Texas and met with the prosecution, and following that meeting Fields was informed that the government might be willing to dismiss the murder case and the Death penalty if petitioner agree that he would not challenge the Using and carrying a firearm during the commission of a crime of violence; ( Escape )', and Using and carrying a firearm during the commission of a crime of violence; ( carjacking ). Petitioner rejected that " offer " stating " I'm innocent!" In Petitioner's Original § 2241 Petitioner presented evidence showing that there were fingerprints in the alleged " carjacking vehicle ", the government had tested those prints against Fields' prints and like Fields had always maintained, he didn't commit a carjacking.  Yet at trial the government procured\ a Steve January to lie and say that " there was no fingerprints or nothing, this thing was clean." No jury or Court have ever seen these forensics reports, but those reports are in Fields' § 2241 in the District Court for the first time..

Petitioner Fields also presented forensics reports to the District Court that  prove he is not guilty of murder either and the prosecution framed Fields and suppressed the evidence that would have exonerated him.

So after rejecting the governments " offer " Fields countered, stating " I just want to go home. I'll plead " No Contest " in order to absolve the government of all blame, but the government have to let me go and the case is over with; done."

Mr. Ellis said tht he would present the government with Fields' counter offer and Ellis later informed Fields that the Government said that

4

they would have to " Go up the chain of command to see if they can make the deal."

On 8/13/18 the Government responded to Sessions v. Dimaya arguing that the Court should reject Petitioner's request for relief claiming that " Fields can't meet the requirement that he's innocent." ( See App. 3 ). Yet Fields' entire Original § 2241 not only proves that Fields is indeed innocent, but that he was intentionally, deliberately, knowingly and willfully framed for the crime(s) of conviction.

However, when the Government filed that response to Dimaya they intentionally neglected to send a copy to Fields although they had constantly and continuously sent Fields everything else that they filed. Government attorney's know that Mr. Ellis will challenge the law, and without Fields' input the prosecution could get away with lying and " loosely " applying the facts.

Petitioner Fields thought the government wasn't going to respond to Dimaya until and/or unless they couldn't " make a deal ", so after " the deal " lingered Fields asked Mr. Ellis and Mr. Isajiw did the government respond to Dimaya and Mr. Isajiw subsequently admitted that they did.

On 10/4/18 Attorney Peter Isajiw sent Fields a copy of the governments response and petitioner Immediately notified the Court that his Counsel and/or the Government had neither sent him that response in a timely matter, and Fields put together a response and sent it to the Court. ( See App. 4 ).

On 10/23/2018 the Court sent Fields response that's in App. ( 4 ) back to Fields with a copy of the Order in App ( 1 ) stating that Fields cannot file directly to the Court.

This Order does considerable damage to Fields because ( the prosecution didn't send Fields a copy of their response ), and Counsel that Fields have to rely on ( didn't send Fields a copy of that response in a timely manner ) so the prosecution is getting away with attempting to mislead and defraud this Court.

This order presents the very same challenges presented in the issue in Fields' Original § 2241 where the 5th Circuit denied Fields his right to file his Pro Se brief and Motions " because Petitioner had attorney's ", and even when Fields elected to dismiss attorney's in order to have his brief and Motions heard the Court still refused,

5

and as a result Fields' evidence of Actual Innocence was never presented to the Court, and Fields' Brady issue went unadjudicated.

## UNDER THE LAW FIELDS HAVE A RIGHT NOT TO HAVE COUNSEL FORCED UPON HIM.

In Price v. Johnson, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed 1356 (1948) the Court held that " A prisoner has no absolute right to argue his own appeal or even to be present at the proceedings in an appellate Court " foreclosed any right of a Pro Se defendant to act Pro Se. But this did not foreclose the right of a defendant to present a " Pro Se " brief. In light of this the Court argued that whether at trial or on appeal a defendant should not be required to have counsel forced upon him or her." In Chamberlain v. Ericksen, 744 F.2d 628, 630 (8th Cir. 1984), cert. denied, 470 U.S. 1008, 84 L.Ed .2d 387, 105 S.Ct. 1368 (1985), the Chamberlain Court, quoting the above styled language from Price v. Johnson, found that a criminal defendant does have the right under the Constitution to present Pro Se briefs or Motions on Appeal." Judge Magnus-Stinson's Order does allow for Fields to file " through his attorney's ", but as noted Fields can't file " through his attorney's " when he's not being sent material to respond to. Having said that, In the past Attorney(s) have suggested to the Courts that Fields may be mentally ill as a way to gain and/or keep control of Fields and his destiny, but Fields is not mentally is and any suggestion of the sort is categorically false! At trial, as Fields was being forced to represent himself it was noted that Fields is not mentally ill, he's " fairly bright " and have an above average IQ. And psychiatrist here at the USP Terre Haute where Fields have been housed since 2004 will also attest to the fact that Fields is not mentally ill.

Having said that, Fields recognizes that Counsel may be needed in some instances; (i.e) to make Court appearances, etcetera, but Fields asks this Court to reverse Judge Stinson's Order and allow Fields to file his own brief(s) and Motion(s) directly to the Court.

6

It's Unconstitutional to force a defendant on Death Row where there is overwhelming evidence of his Innocence to rely on Attorney(s) that's pushing a " Johnson Issue " in lew of Actual Innocence. Fields isn't against keeping attorney's, but he would have to do so with set boundaries. One being that Actual Innocence have to be the top priority; (2) Counsel would have to make sure that Fields get everything the government file, right when they file it, and (3). Counsel cannot file anything without letting Fields see it first; And (4) Fields will be able to file Petitions straight to the Court when he see fit.


## PETITIONER FIELDS IS ACTUALLY INNOCENT OF MURDER AND "CARJACKING".


On or about November 6, 2001 Petitioner Sherman Lamont Fields walked away from a privately held Federal jail ran by Civigenics Corp. in Waco, Texas after a guard at the jail provided Fields with a key to a door. ( There was no violence involved in the " escape ", there was no weapon, Fields simply opened the door when no one was around and walked away.) At the time Fields was in jail on charges of being a felon in possession of a firearm and ammunition. ( The charges stemmed from an October 2000 arrest where Fields shot a LaDon King, a HITMAN that was hired to kill Fields. The police rushed into a residence, arrested Fields and then searched the house against the expressed wishes of the homeowner and without a search warrant and found a gun under a mattress. Fields wasn't charged with the gun, but a year later in Sept. 2001 the State pushed the Feds to charge Fields with being a felon in possession after they realized that they wouldn't be able to prosecute Fields for shooting the HITMAN. Fields' Court appointed attorney went to the government with a necessity defense although Fields categorically denied possessing that particular gun. The government said that " Fields should have just called the police ", however the HITMAN LaDon King

7

was already WANTED for kicking another guys door in and shooting him eight times with a .40 Caliber and the police had failed to apprehend him. And then after LaDon King was shot he escaped from the hospital, pulled a gun on a police officer and went after Fields again. When the government refused to drop the gun charges that is when Fields walked away from the jail.)

Petitioner Fields had several " girlfriends " and two of them, Shalaykea " Lakie " Scroggins and Suncerey " Shining Star " Coleman had been locked in a long running feud over Fields' affection. Four months prior to Coleman's murder Shalaykea Scroggins wrote several letters expounding upon her obsession for Fields, stating, " I know it's like obsession...I lost you to "that girl" (Coleman) once, I won't let it happen again." And she wrote that if she were to lose Fields again she would be " Killing bitches!" ( See App. 5. ).

A week before the murder Scroggins approached Ms. Coleman in an altercation that almost turned physical. ( See App. 6.) And even though Fields was in jail Scroggins continued to stalk Fields. Scroggins illegally got a phone turned on in Fields' name and started calling Coleman threatening her, so the day before the murder Fields and the victim, Ms. Coleman called the phone company together and informed them that Scroggins had gotten the phone illegally and she was calling Coleman threatening her; The phone company cut the phone off. ( See App. 7.)

After Fields walked away from that jail Scroggins followed up on her promise that she would be " killing bitches " and murdered Ms. Coleman. Scroggins had an Accomplice, a guy named Edward Lee " Treyboy " Outley, whom was supposed to be in a relationship with Scroggins' half sister, " Na-Na ", but according to Scroggins, Outlet " wanted her "; (Scroggins). Both Outley and Scroggins gave several different and conflicting alibi's for their whereabouts at the time of Coleman's murder. Scroggins first claimed that she was " at the store around the corner from her house, buying something to drink and a box of black and mild cigars," while Outley " went looking for Fields." ( See App. 8.)   However two months later when Scroggins found out that the store was closed at that time she changed her story and claimed that she " went straight to her sisters house and went to sleep", while Outley " went home with her sister Na-Na." ( See App. 9. ) Outley contradicted both of Scroggins' alibi's he said that he neither " went looking for Fields ", nor did he " Go home with

8

Na-Na, Outley said that he was " out selling drugs." ( See App 10.)

Outley and Scroggins then conspired with each other to hide the car that they were in when they murdered Coleman so the victims blood wouldn't be found in the car intertwined with their DNA. Outley and Scroggins was in a GOLD Jaguar. ( See App. 11 ). Outley lied and said that the Jaguar was BLUE. ( See App. 12 ) Scroggins lied and said that the Jaguar was BLUE. ( See App. 13 ). The Government knew that they were lying because they found the man that told them that his car was GOLD, yet the government was so intent on framing Fields for the murder they still set out to defraud the Court after the fact, telling the jury that the Jaguar was indeed BLUE , while knowing all along that the  " BLUE " Jaguar didn't even exist at the time of Coleman's murder. ( See App. 14. )

There was no evidence tying Fields to Coleman's murder, it was quite the contrary, all of the evidence pointed to Scroggins and Outley, but in order to " make Fields guilty ", the government went " Seeking jailhouse testimony ". ( See App. 15 ). Next the government conspired with the real murderers and attempted to procure a false eyewitness, the government wanted Outley and/or Scroggins to say that they were " with Fields." ( See App. 16 ). " With Fields " could only mean that they wanted Outley and/or Scroggins to lie and say that they witnessed Fields kill Coleman since they were saying that Fields was the guilty party.

Also the government recruited a Chance Alexander to lie and say that Fields confessed to him, but at the last minute Alexander admitted that he don't even know Fields and he lied because he was promised that he would be let out of jail. ( See App. 17 ).

On their quest to frame Fields the government procured a Sheriff Detective Johnny Spillman to lie and say that when Fields came into contact with the victim on the night of the murder Fields became " Irate." ( See App. 18 ). The government also procured a U.S. Marshal named Chris Casson to lie and say that Coleman's cousin, Tanesha Hilliard, whom was present said that Fields became " angry." ( See App. 19.)  Yet Tanesha Hilliard had always maintained that Fields was never mad. ( See App. 20 ). And as a matter of fact, Fields and Coleman were " Hugging and kissing." ( See App. 21 ).

To further  " muddy the waters " the government procured a lady whose husband robbed an elderly couple and murdered the woman. The lady, a Tammy Edwards claimed that when Fields was out he jacked her for her car.

9

Tammy Edwards first claimed that her car was jacked by " an unknown black male ". ( See App. 22 ). But two years later she set out to sue Civigenics and in her deposition she claimed that " she knew it was Fields the moment she saw him." ( See App. 23 ).  And then she said, " Oh, he shot at me too." ( See App. 24 .) Now this was supposedly at shift change, at a major hospital with people coming and going, amid " yelling and screaming ", a " struggle ", and a loud " gunshot ", yet no one saw or heard anything, but Tammy Edwards? Impossible!

The government knew that she was lying, there were twelve latent prints found in her car. ( See App. 25 ). The prints were checked against Fields' prints and they didn't match. ( See App. 26 ). However the jury never knew that there were fingerprints, nor did the jury know that those prints exonerate Fields because in their effort to frame Fields for the crime and with malice aforethought the government procured a Detective Steve January to lie and defraud the Court stating " there were no fingerprints or nothing, this thing was clean." ( See App. 27 )

The same thing happened in regards to the car that Fields was driving when Coleman was murdered. The car was subjected to forensics testing and obviously there was no blood found because Fields didn't kill Coleman. However the government procured Sheriff Detective Morris " Bubba " Colyer to lie and say that there was no blood found because the car " looked detailed or wiped down " ( See App. 28 ). The government chose Detective Colyer whom isn't even a forensics expert rather than call their own forensics expert to the stand whom would have testified that '" even if a vehicle is " detailed " or " wiped down " forensics have technology that would still find blood." But in addition to that Fields vigorously argued that he did not " detail " or " wipe down " no vehicle, stating " I wouldn't be at a car wash that late at night, right after I walked away from that jail so the first police that drive by would stop to see why a young black male was at the carwash at that hour." But most importantly there is forensics reports that show that the car was " not clean " like Detective Colyer and the prosecution defrauded the Court to believe. ( See App. 29 ). And the report also state that there are pre and post forensics photo's that will undoubtedly show that the car was not clean. However the jury never saw the forensics report, and the government, with malice aforethought Illegally and Unconstitutionally suppressed the photo's. And because of the governments illegal and Unconstitutional actions Fields was convicted and sentenced to die. Fields Filed his 2241 in the District of

10

incarceration and the government was ordered to respond.

## ARGUMENT

After " seeking jailhouse testimony " the prosecution presented a strictly " jailhouse testimony " case to the jury with inmates, 99.9% of Fields didn't know and had never even seen before, all claiming that Fields confessed to them. In closing the prosecution summed up that " jailhouse testimony " arguing that it meant Premeditation and implored the jury to find Premeditation because of it. ( See App. 30    ).

The jury listened, weighed the testimony and found that " it was not Premeditated ", choosing not to believe the " jailhouse testimony ".

The jury only had one question during Guilt/Innocence, they wanted to see the forensics for the car that Fields was driving that night. ( See App. 31    ). The Judge denied that request. ( see App. 32    ). Thus all the jury had to go on was Detective Morris " Bubba " Colyer's false testimony that they didn't find blood in the car  because the car " looked detailed " or " wiped down ". If the jury would have seen the forensics report showing that the car was " not clean ", Fields would have been exonerated; If the prosecution had not violated Napue v. Illinois and procured Detective Colyer to lie, Fields would have been exonerated; ( Especially in light of the fact that Shalaykea " Lakie " Scroggins and Edward Lee " Treyboy " Outley had hid the car that they were in so the car wouldn't be subjected to forensics testing ); But most importantly, If the government had not violated Brady v. Maryland and suppressed the Pre and Post forensics photo's proving that the car was " Not Clean " and Detective Colyer was lying, defrauding the Court and deliberately misleading them, Fields would  have been exonerated.

In response to this issue in Fields' § 2241 the Prosecution relies on their past method of fraud and deception that have brought them this far, and inadvertently admit that they suppressed the photo's, claiming " there are no photo's and it's just conjecture  on Fields' part." ( See App. 33   ). Yet it's their own forensics report that state that they have 35mm photo's in their possession.

Given the true facts devoid of the governments deception,  and the physical evidence that no jury or no Court have ever seen ( the forensics reports and the photo's ), no jury would/could have

11

found Petitioner guilty.

The facts of the " carjacking " is likewise. The prosecution lied and said " there was no fingerprints or nothing, this thing was clean ", while knowing all along that there were fingerprints and they had checked the fingerprints against Fields' prints and there was no match.

It's a known fact that jurors view physical evidence favorably and had they known that there were fingerprints in a case like this where the alleged victim lies about the identification of the alleged assailant, the jury will invariably find that the defendant is Not guilty and the prosecution knew that  that's why they lied about the fingerprints.

If the prosecution had not violated Napue v. Illinois and procured Detective January to lie and say that there was " no fingerprints," Fields would have been exonerated; And if the jury had seen the forensics reports showing that there are fingerprints and, (1) Those prints exonerate Fields; And (2) Detective January was lying, defrauding the Court and misleading them, Fields would have been exonerated.

The above as layed out by Fields establishes a " colorable showing of innocence "; Kuhlman v. Wilson, 477 U.S. at 454 & n.17, 106 S.Ct. at 2627 & n.17; Schlup v. Delo, 513 U.S. 298, 314-16, 130 L.Ed .2d 808, 115 S.Ct. 851 (1995). The governments actions violated and still violates Fields' Due process rights and due process prohibits the conviction of either a legally and/or factually innocent person; Gardens v. Stephens, Sup. Ct. #13-546 (2013) cert. pending, (5th Cir. 8/2/13). The evidence that the jury was permitted to hear was impermissible, materially inaccurate and demonstrably false. Duest v. Singletary, 967 F.2d 472, 482 (11th Cir. 1992), vacated on other grounds, 507 U.S. 113 S.Ct. 1940, 123 L.Ed .2d 647, (1993). And the lowest degree of confidence in a jury verdict " occurs when the jury has  heard a corrupted body of evidence "; In Re Davis, No. CV-409-130 (8/24/10). The evidence undoubtedly proves that the prosecution improperly suppressed and/or withheld evidence and used perjury to undermine the forensics that would have exonerated Fields. Mooney v. Holohan, 294 U.S. 103, 113 (1935), thus Fields is Actually and factually Innocent and forcing

Fields or any innocent man to <u>wait</u> on the litigation of a " Johnson Issue " where it's clear that release should be immediate is violatile of the U.S. Constitution and Constitutes Cruel and Unusual Punishment; In Re Kemmler 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed 519, the intentional and malicious infliction of this wanton and unnecessary inhumane treatment forced upon Fields by rogue cops and prosecutors is Cruel and abusive; Cruel and unusual, barbaric in nature and it violates the United States Constitution. See U.S. Const. Amend. VIII; Bass v. Perrin, <u>170 F.3d 1312</u>, 1316 (11th Cir. 1999) " The cruel and Unusual Standard applies to the conditions of a prisoner's confinement." Chandler v. Crosby, <u>379 F.3d 1278</u>, 1288 (11th Cir. 2004). Thus there should be no greater cruelty than forcing an innocent man to " wait and suffer " when the evidence of his innocence is as clear as it is here in Fields' case. But specifically, " the Eighth Amendment prohibits punishments " which are incompatible with the evolving standards of decency that mark the progress of a maturing society," or " which involve the unnecessary and wanton infliction of pain." Estelle v. Gamble , <u>429 U.S. 97</u>, 102-103, 97 S.Ct. 285, 290, <u>50 L.Ed .2d 251</u>, (1976); Making Fields " wait " for what should be immediate release at this point is unnecessary and only further serves to punish, inflict and cause wanton pain on an innocent man, thus this Court should rectify this issue once and for all. ( Fields incorporates all issues herein that's in his original § 2241 at Fields v. Warden USP Terre Haute, No. 2:16-cv-418-JMS-MJD)

## A WRIT OF MANDAMUS IS APPROPRIATE

The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue extraordinary writs in its discretion. " to justify the granting of any such writ, the petition must show that the writ will be in aid of the Court's appellate jurisdiction, that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other form or from any other court." SUP. CT. R. 20.1; See also U.S. Alkali Export Ass'n v. United States, 325 U.S. 196, 201-02 (1945); De Beers Consol. Mines, Ltd. V. United States, 325 U.S. 212, 217 (1945).

This Court may grant a mandamus petition so long as it has jurisdiction over the matter. As the Court explained in Cheney v. U.S. District Court:

[Mandamus] is a drastic and extraordinary remedy reserved for really extraordinary causes. The traditional use of the writ in aid of

13

appellate jurisdiction both at common law and in the federal courts has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction. Although courts have not confined themselves to an arbitrary and technical definition of " jurisdiction ", only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion, will justify the invocation of this extraordinary remedy.

542 U.S. 367, 380 (2004) (citations and internal quotation marks omitted). Cheney made clear that three conditions must be satisfied before such an extraordinary writ will issue: (1) the party must have no other adequate means to attain the relief he deserves; (2) the party must show that his right to issuance of the writ is clear and indisputable; and (3) the issuing court must be satisfied that the writ is appropriate under the circumstances. Id. at 380-81. Petitioner satisfies all three conditions here.

Petitioner can't get the relief he deserves in the District Court because the Judge forced Counsel on Petitioner who supplemented the brief with a " JOHNSON ISSUE ", and every since Counsel was forced on Petitioner, Fields have continuously asked Counsel to " file something in regards to my Actual Innocence " to no avail.; Fields is Actually Innocent so his right to this writ is Undisputably clear; And there is no doubt that this Writ is appropriate under the circumstances, the 7th Circuit is one of many Circuits that recognize Actual Innocence and allow for newly presented exculpatory evidence, meaning evidence that was not presented to a jury. Against the backdrop of Fields' Actual Innocence this WRIT OF MANDAMUS/WRIT OF ACTUAL INNOCENCE is appropriate.

## CONCLUSION

Petitioner Fields asks that this Court instruct the District Court to place Fields' Actual Innocence front and center and grant Petitioner the relief requested in his Original § 2241 that's currently before the Southern District of Indiana ( Terre Haute Division ) and Order Fields' Immediate release; Or in the alternative, Fields asks that this Court have his Original § 2241 sent up from the Southern District of Indiana and this Court grant the relief requested and issue a Writ of Actual Innocence

14

and Order Petitioners immediate release.

Authorized by the Act
July 7, 1955 to Administer
Oaths (18 U.S.C. 4004)

Case Manager

Sincerely/Respectfully
Sherman Lamont Fields    10/26/18
#15651-180
USP Terre Haute
P.O. Box 33
Terre haute, Indiana
                47808
                Pro Se

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

SHERMAN FIELDS,                        )
                                       )
                        Petitioner,    )
                                       )
            v.                         )   No. 2:16-cv-00418-JMS-MJD
                                       )
WARDEN, USP TERRE HAUTE,               )
                                       )
                        Respondent.    )

## Entry for Conference of May 30, 2017

A telephonic conference was conducted on May 30, 2017. The petitioner participated in person and his counsel of record also participated. As previously determined, the conference was *ex parte* and *in camera*. The court reporter was Jean Knepley.

The question of the petitioner's representation was discussed. Having considered such matter, and being duly advised, the Court rules as follows:

1.      The representation of counsel of record for the petitioner shall **continue.**

2.      The petitioner's request that his desire to have the opportunity to submit a pro se supplemental brief dkt [15] is **granted in part.** The petitioner may submit his response, through counsel, who will attach it to the brief submitted by counsel. The Rule 11 consequences of such submission lie with the petitioner himself, not with his attorneys. The petitioner shall not file material directly with the Court and material received directly from the petitioner, if submitted, shall be returned unfiled.

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE

| | |
|---|---|
| SHERMAN FIELDS,<br><br>    Petitioner,<br><br>v.<br><br>WARDEN, USP TERRE HAUTE,<br><br>    Respondent. | NO. 2:16-cv-00418-JMS-MJD<br><br>ORDER STAYING PROCEEDINGS |

## ORDER STAYING PROCEEDINGS

This Court orders a stay of these proceedings to allow the parties to attempt to reach an agreed resolution [52]. Mr. Fields shall file a report every 30 days regarding the status of negotiations. If either party reports that an agreed settlement cannot be reached, this Court shall dissolve the stay.

Date: 8/16/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Electronically registered counsel via the Court's CM/ECF system.

*States*, 119 F.3d 468, 469 (7th Cir. 1997)) (emphasis added). Thus, in rejecting Fields's bid to file a successive § 2255 motion, the Fifth Circuit necessarily found his claim without merit. Fields's contention that the Fifth Circuit erred in doing so, *see* Reply 4-5 & n.3, ECF No. 25, is beside the point. "[A] claim of error in addressing the sort of constitutional theory that has long been appropriate for collateral review does not render § 2255 inadequate or ineffective." *Taylor*, 314 F.3d at 835.

Not only has § 2255 already afforded Fields the opportunity to present his constitutional argument about the validity of § 924(c)(3)(B), but he may have another opportunity if the Supreme Court ultimately addresses that question. As noted above, § 2255 allows post-conviction motions that rely on new, retroactive, constitutional rules. *See* § 2255(h)(2). Although no such rule currently invalidates § 924(c)(3)(B), "[i]f § 924(c)(3)(B) is ultimately held to be unconstitutional, that finding may open the door to future collateral challenges to sentences rendered under that statute." *United States v. Williams*, No. 16-20815, 2018 WL 3621979, at *2 (5th Cir. July 30, 2018). Accordingly, Fields has not identified the sort of "structural problem" in § 2255 that the Seventh Circuit has considered necessary to trigger the savings clause.

Fields also fails to meet the Seventh Circuit's third requirement for resort to the savings clause, that the error be so "grave" as "to be deemed a miscarriage of justice . . . such as one resulting in a conviction for a crime of which he was innocent," *Camacho*, 872 F.3d at 813 (internal quotation marks omitted). At best, Fields has a claim that a jury, rather than a judge, should have decided that his escape was a crime of violence. *See infra* pp. 11-25. That sort of claim does not trigger the savings clause. *See Prevatte*, 865 F.3d at 899-900 (finding no miscarriage of justice where the evidence overwhelmingly supported the a finding that should have been made by a jury rather than a court). For this additional reason, Fields cannot meet the Seventh Circuit's requirements for resorting to the savings clause.

Your Honor, at or about 10/03/2018 I sent you a letter informing you that I had not received the Governments reply brief to Dimaya in Fields v. Warden USP Terre Haute, No. 2:16-cv-418-JMS-MJD.

On Thursday 10/04/2018 my counselor brought me a copy of the Governments reply from my Attorney Peter Isajiw and at that time I did sign for said brief..

Throughout this process the government have repeatedly sent me a copy of everything they've filed, in addition to them sending it to my Court Appointed Counsel, yet this time they deliberately did not send me their reply because they know that Counsel will challenge them on the law and they will get away with " loosely applying the facts." Whereas they know that I don't know the law, but I know the facts and I'm not going to let them get away with lying and defrauding the Court(s) anymore... In order to make the record complete I ask that this Court now accept the following as an addendum to my § 2241...

Respectfully/Sincerely

Sherman Lamont Fields
#15651-180
USP Terre haute
P.O. BOx 33
Terre Haute, Indiana
            47808

This Court previously forced counsel upon Petitioner and Ordered that petitioner can only file through said counsel, but as the previous letter proves petitioner can't respond through counsel if Petitioner isn't being sent anything to reply to. So in the interest of Justice petitioner solemnly prays that the following response be added to Petitioner(s) attorney's response.

Case: 18-3389   Document: 1-1   Filed: 11/07/2018   Pages: 102

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

SHERMAN LAMONT FIELDS,
        Petitioner.

                                    No. 2:16-cv-418-JMS-MJD

    v.


WARDEN USP TERRE HAUTE,
        Respondent.


PETITIONER(S) REPLY TO RESPONDENT'S SUPPLEMENTAL
BRIEF ON SESSIONS v. DIMAYA

Petitioner is actually Innocent.


CAPITAL CASE

( DEATH PENALTY )



                        Sincerely/Respectfully

                        Sherman Lamont Fields
                        #15651-180
                        USP Terre Haute
                        P.O. Box 33
                        Terre Haute, Indiana
                                    47808

" ESCAPE " WHERE PETITIONER SHERMAN
LAMONT FIELDS JUST WALKED AWAY FROM
THE JAIL ISN'T A CRIME OF VIOLENCE
BECAUSE THE EVIDENCE PROVES THAT FIELDS
IS INNOCENT OF MURDER

While claiming that " ESCAPE " is a crime of violence the Government is still attempting to Defraud this Court. First the Government referenced the false testimony of Inmate(s) Dominique Tubbs and Chris Quigley, two friends from a small town South of Waco, Texas that was in jail on the same " Secret Indictment " for drug trafficking. The two men were in the same tank as Fields prior to Fields walking away from the jail.

Petitioner Fields would like to Preface this by saying that Fields and the two guys, Tubbs and Quigley were not even associates, and Quigley admits that he and Fields had several arguments during the month or so that they shared the cell. ( See Trial Transcripts, pgs. 1228-1229 ).

At 1:00 A.M. roughly six or seven hours after Fields walked away from the jail Inmates Tubbs and Quigley were SEPARATED and interviewed. ( See Report of Investigation, App. 1 ).

17 hours later at 6:00 P.M. that evening two U.S. Marshals from Austin, Texas, Marshals Sheely and Shaddix flew in and reinterviewed Tubbs and Quigley. ( See Report of Investigation, App. 2 ).

Tubbs nor Quigley could provide no useable information.

A week later on November 13, 2001 Waco Police Detective Steve January ( The same Detective that the prosecution led into perjury whom claimed that there were no fingerprints in the alleged " carjacking " vehicle ), he went to the Villages apartments complex and talked to Edward Lee " Treyboy " Outley, the guy that claim that Fields killed Coleman, and the guy whom Fields said helped Shalaykea " Lakie " Scroggins kill Coleman. ( See App. 3 ).

And after this conversation with Outley Detective Steve January went out to the jail to " reinterview " Tubbs and Quigley two days later on November 15, 2001 and this time Detective January walked away with statements that he wrote himself and the two inmates signed claiming that they heard Fields threaten Coleman.

Detective January wrote and filed reports in relation to everyone that he talked to, but neglected to file a report in relation to his contact with Edward Lee " Treyboy " Outley just two days before going out to the jail and writing the statements for Tubbs and Quigley. Instead Detective January attempts to distance himself from Outley by first writing a report alleging that he wasn't there when Outley was arrested on November 13, 2001, stating that the next day, November 14, 2001 at 1:30 A.M. he received a phone call from U.S. Marshal Parnell Mcnamara

1

who told him that they had arrested Outley. ( See App. 4 ).

But two years later at Trial Detective January forgot that he'd said that he wasn't there and admitted that he was indeed there. ( See Trial Transcripts, pg. 1333 ).

Fields asked Detective January was he the first one on the scene and again January lied, attempting to keep that barrier between him and Outley. January claimed that the U.S. Marshals was there first and they called him over there. ( See Trial Transcripts, pg. 1334 ).

But a report filed by U.S. Marshal Chris Casson states that " On 11/13/01 at approximately 1430 hours, U.S. Marshals received information from the Waco Police Department that Fields had been seen at 1100 North 6th, Waco, Texas. Upon arrival, DUSM's encountered Waco Police Detective Steve January speaking with Edward Outley. ( See Report of Investigation, App. 5 ).

Edward Lee " Treyboy " Outley also admitted that Detective Steve January held him up until the Marshals arrived. ( See App. 3 ).

It's obvious that Detective January is trying to hide the fact that he talked to Outley just two days prior to going out to the jail and writing statements for Tubbs and Quigley.

And what lends further credence to the fact that Detective Steve January coached Tubbs and Quigley besides the fact that they had been interviewed twice by Sheriff Detectives and U.S. Marshals and couldn't provide no useable information while they were SEPARATED is that Tubbs lied and claimed that he didn't know that Coleman was dead until he read it in the newspaper. ( See Trial Transcripts, pg. 1217 ). Yet his friend Chris Quigley admitted that Detective January told him and Tubbs that Coleman was deceased while Fields was " still free ", out on escape status. ( See Trial Transcripts, pg. 1231 ). The newspaper announcing Coleman's death came out on December 12, 2001 and Fields was " no longer free ". And the only police officer that Tubbs and Quigley talked to " while Fields was still free ", besides the immediate interviews the day Fields walked away from the jail, is Detective Steve January on November 15th, the day that January wrote the statements for them.

At trial Quigley said that Fields did not tell him that he was going to kill Coleman. ( See Trial Transcripts, pgs. 1228-1229 ). But two years earlier On February 26, 2002 Quigley told the Grand Jury that Fields did indeed tell him that he was going to kill Coleman. ( See. App 6, Quigley's Grand Jury testimony, pgs., ___ 10 ).

2

Tubbs claimed that Fields threatened Coleman on the phone when Scroggins told Fields via telephone conversation that Coleman was on Crenshaw bopping. ( See Trial transcripts, pg. 1210 ). But on direct examination Tubbs renders that statement impossible, he said that after Scroggins told Fields on the phone that Coleman was on Crenshaw bopping, Fields didn't express his anger to Tubbs about the situation. ( See Trial Transcripts, pg. 1207 ). So there is no way Tubbs could have known what Scroggins supposedly told Fields if Fields didn't express his anger to Tubbs, because Tubbs is claiming that he heard a one-sided phone conversation.

And after Tubbs and Quigley testified the prosecution implored the jury to find premeditation. ( See Governments closing argument, App. 7 ). Yet the jury found that it was not Premeditated, ( See App. 8 ). Lending credence to the fact that the jury did not believe Tubbs and Quigley.

The evidence that Tubbs and Quigley were coached in order to frame Fields for Coleman's murder is overwhelming in light of the governments efforts to procure other false witnesses against Fields. In February 2002 when Tubbs and Quigley were testifying in the Grand Jury the prosecution was out " seeking jailhouse testimony ". ( See App. 9 ). Then the prosecution tried to get Scroggins and/or Outley to lie and say that they were " with Fields ". ( See App. 10 ). And then they hired a Chance Alexander to lie and say that Fields " confessed to him ", although Alexander don't even know Fields. ( See App. 11 ). So the government can't hang their hat on Tubbs and Quigley's false testimony as a basis to declare that Fields " walking away from a jail " is a crime of violence. The jury didn't find Fields guilty because of Tubbs and Quigley's perjured testimony, the jury found Fields guilty because the government procured Sheriff Detective Morris " Bubba " Colyer to lie and say that there was no blood found in the Grand AM that Fields was driving because the car looked " detailed or wiped down ". ( See Trial Transcripts, pgs. 1924-1925 ). While knowing that the Grand Am was not clean. ( See Forensics report, App. 12 ). And the government suppressed the pre and post forensics photo's that would have shown that the Grand Am was not clean.

In response to Fields' Brady issue in his § 2241 that's before this Court the government lied again in an attempt to defraud this Court just as they've done in other Courts, claiming that " there are no photo's "

3

and it's just " conjecture on Fields part." ( See App. 13 ). But as noted in Appendix 12, the governments own forensics report state that they have 35mm photos.

Also as noted the jury only had one question during Guilt/Innocence, they wanted to see the forensics from the Grand Am. ( See App. 14 ). The Judge denied that request. ( See App. 15 ). Thus (1) If the government wouldn't have procured Detective Colyer ( whom isn't even a forensics expert ) to lie, Fields would not have been convicted; (2) If the government would have called a real forensics expert, that expert would have testified that even under the conditions that Colyer wanted the jury to believe forensics would have still found blood; and (3) If the government wouldn't have suppressed the forensics photo's which is both impeaching and exonerating, and the jury would have been allowed to see that the Grand Am was not " clean " and detective Colyer was lying, Fields wouldn't have been convicted. Especially in light of the fact that the two people that Fields said committed the murder, both Edward Lee " Treyboy " Outley and Shalaykea " Lakie " Scroggins conspired to hide the car that they were in when Coleman was murdered. Outley lied and said that the Jaguar was BLUE. ( See App. 16 ). Scroggins also lied and said that the Jaguar was BLUE. ( See Trial Transcripts, pg. 1635 ). Outley and Scroggins conspired to hide the Jaguar so forensics would not find their DNA in the Jaguar intertwined with Coleman's blood, and the government knew they were lying about the Jaguar because on October 28, 2003 just three months prior to trial they found the Owner of the Jaguar, a guy named Lutrill Payne, and he told them that his Jaguar was GOLD. ( See App. 17 ). Yet when Fields called Mr. Payne to testify at trial the government deliberately, knowingly, intentionally and willfully with malice aforethought still tried to defraud the jury telling them that Outley and Scroggins was indeed in a BLUE Jaguar that didn't even exist when Coleman was murdered. ( See App. 18 ). It's clear that the governments intent was to convict Fields and murder him via lethal injection by all means necessary innocence be damned. Thus while Fields did walk away from that jail the evidence clearly shows that Fields is innocent of murder and he was framed for Coleman's murder. And in light of the facts instead of the government admitting that Fields was framed and releasing him from custody the government choose to double down and keep attempting to defraud this Court with false evidence and false narratives so they can use this government institution to murder Fields in the pretense of Justice.

4

THE ALLEGED " CARJACKING " ISN'T A CRIME
OF VIOLENCE BECAUSE THE EVIDENCE PROVES
THAT FIELDS IS INNOCENT OF CARJACKING.

The alleged carjacking victim, a Tammy Edwards first wrote a statement saying that her car was taken by an unknown black male. ( See App. 19 ). Two years later while sueing Civigenics corp. Mrs. Edwards said that she immediately knew that it was Fields. ( See App. 20 ). Then she said, " Oh he shot at me too." ( See App. 21 ).

Now this supposedly happened at a major hospital with people coming and going at shift change, there was a struggle, yelling and screaming, and and a gunshot, yet no one saw or heard anything, but Tammy Edwards; Impossible.

But most importantly, at trial the government defrauded the Court, telling the jury that there were " no fingerprints or nothing "... " this thing was clean." ( See Trial Transcripts, pg. 1326 ), while knowing all along that that wasn't true. There were twelve latent prints all of AFIS quality. ( See App. 22 ). Those prints were checked against Fields' prints and there was no match. ( See App. 23 ). No jury or Court have ever known that there were indeed fingerprints and those prints don't match Fields. But that evidence is now before this Court in Fields' § 2241 for the first time. Had the jury known about the fingerprints and the results of those prints Fields would have been exonerated, thus the Government can't hang their hat on an alleged " carjacking " that the evidence proves that Fields is innocent of to declare that the alleged carjacking is a crime of violence.

CONCLUSION

Fields' case is the right case to Invalidate 924(c) because it proves that the ' ordinary case ' analysis could be very deceptive, especially in light of Actual Innocence. And it further proves that 924(c) is too vague to be Constitutional. But most importantly and above all else Mr. Fields himself is Actually Innocent. So in addition to Invalidating 924(c) this Court should Grant the remaining issues in Fields' § 2241, finding that District Judge Walter Smith and Fifth Circuit Court of Appeals Judge Edith Jones was both effectively bias and robbed Fields of his appeals; This Court should find that Fields is actually Innocent and that the Government violated Brady v. Maryland and Napue v. Illinois in order to effectuate the guilty verdict(s) and Death Penalty of an innocent man; This Court should find that Fields was denied his Constitutional Right to file a Pro Se brief and Motions and that the Government perpetrated a Fraud on the Court(s); This Court should find that the government did indeed solicit Fields' murder via lethal injection with the intent to commit criminal homicide via lethal injection and they joined into a seditious conspiracy to effectuate those criminal act(s) in violation of Fields' Constitutional Rights; This Court should find that Fields' conviction(s) and death Sentence was influenced by passion, prejudice and Other arbitrary factors and that the Death penalty and the antiterrorism and Effective Death penalty Act is both Illegal and Unconstitutional.

In the Interest of Justice, to avoid a fundamental miscarriage of Justice ( the sanctioned murder of an innocent man ), and to protect the integrity of the Judicial system, Fields asks that this Court grant his § 2241 and his amended § 2241 on every issue. Furthermore, the government concluded their brief, " That in the event the Court grant the aforementioned relief they should be able to retry Fields if they want to " . Yet Petitioner believes that due to the evidence of Actual Innocence the government shouldn't be allowed to get a second bite of the apple being that they intentionally brought us to this point by knowingly and willfully fabricating evidence to convict Fields, and suppressing and withholding evidence that exonerates Fields, so in the interest of Justice Fields asks that the Court bar a retrial and end the continued violation of Petitioner's constitutional rights once and for all..

Respectfully/Sincerely

Sherman Lamont Fields
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, Indiana
47808

72002  15:48    2547755701    EXECUTIVE SUITES    PAGE  17

Song: I dont mean i L
Artist: R. kelly

Hey Sweetie,                                    7-7-02
              By the time my notation arrives
I hope you are in the very best of health.
Before I even get into this letter. I know
I tripped out, I really didn't think I would
fuck the card up for real. Baby, I'm sorry I hope
you can forgive me. Baby it's just that
Now that were back together, I'm not taking
any chances so someone trying to take you
from me. I've been through this once. I will
not let it happen to me again. So please
understand why I dont want you talking to
anyone. Sherman + us... I LOVE you baby.
I do. I really dont want to lose you. I hope
that this time its Just me & you. Baby
Please dont go talk to anyone because
I did that. When you get your and-
Call me, I'm not going to mess it up. Baby
this. 2 days I've missed your voice. I really
feel bad for what I did. Baby, I'm
Sorry. I Love You baby. I hope we can work
this out. I know you still my and g.n.
I and why you don't ride her call me.
Anyway, Baby, I was real upset, Because
I saw myself loosing you again. I had

002  16:48  2547755701  EXECUTIVE SUITES  PAGE  18

happen again. I told you I'm killing bitches. So, I hope you're ready for it to be me & you baby. Just the way it should be. I love you. I don't know if you love me like I love you. We need to try to regain that. I really want to be with you Micky long. I think of you constantly. Now what I did hurt you. It's killing me on the inside. I know I need to hear your voice. Baby I need you. I'm not going to give up until I have you Sherman. You are my world baby. It's always been like that. I stop being with you because of the way you were handling things. Then I seen that it might be getting you. I was glad that it wasn't too late for us. See baby, it's just the beginning for us. When we thought it was the end. I love you baby, with all my heart & soul. Whatever it takes to make things up with you I'm willing to do. I'm getting ready to go work at Starview Monday 3-11pm. So when you can call, call before 3pm. Please don't be mad baby. I love you baby more than anything in the world. I need I hurt all you a letter from you. I wasn't going

EXECUTIVE SUITES    PAGE 19

to write you. I miss your voice Baby,
I promise to do things better than I was.
I just have to trust you again. It's hard.
when you betrayed me before. I've been
trying before. When me happen, it wasn't that
hard to trust you. I am trying baby. I do
love you baby. I miss you. with all my heart..
know that forever Baby I will always

Your

me. Shja'lko.
            Tickls.

Song: I don't mean it
Artist: R-Kelly

7-7-0?

Hey Sweetie,

By the time my notation arrives I hope you are in the very best of health. Before I even get into this letter, I know I tripped out. I really didn't think I would fuck the card up forreal. Baby, I'm sorry. I hope you can forgive me. Baby it's just that now that we're back together, I'm not taking any chances on someone trying to take you from me. I've been through that once. I will not let it happen to me again. So please understand why I don't want you talking to anyone. Sherman Fields...I love you baby. I do. I really don't want to lose you. I hope that this time it's just me and you. Baby please don't go talk to anyone because I did that. When you get your card call me. I'm not going to mess it up. Baby these two days I've missed your voice. I really feel bad for what I did. Baby, I'm sorry. I love you baby. I hope we can work this out. I know you still call that girl. I don't know why you didn't have her call me. Anyway, baby, I was real upset because I saw myself losing you again. I let it happen the First time, I'm not going to let it happen again. I told you, I'm killing bitches. So I hope you're ready for it to be me and you baby. That's the way it should be. I love you. I don't know if you love me like I love you. We need to try to regain that love. I really want to be with you. All day long I think of you constantly. Now that I've hurt you, it's killing me on the inside. I know I need to hear your voice. Baby I need you. I'm not going to give up until I have you. Sherman, you are my world baby. It's always been like that. I stop being with you because of the way you were handling things. Then I seen that I couldn't get over you. I was glad that it wasn't too late for us. See baby, it's

Just the beginning for us, when we thought it was the end. I love you baby with all my heart and soul. Whatever it take to make things up with you I'm willing to do. I'm getting ready to go to work. I started Monday 3-11 pm. So when you do call, call before 3 pm. Please don't be mad baby. I love you baby. More than anything in the world. I'm mad I haven't got a letter from you. I wasn't going to write you. I missed your voice. Baby, I promise to do things better than I was. I just have to trust you again. It's hard when you betrayed me before. I've been trying, before all this happened it wasn't that hard to trust you. I am trying baby. I do love you baby. I miss you with all my heart. Know that Forever baby, I will always.

Love,

Mrs. Shalaykea

Fields.

but trying to see how we gone do this. I know as of today you have my aid. Should read. But you're over me Stevan, we are so much things within that I said yeah. All I have been is good. Because a few misdeeds and mistakes. I never cheated on you. Not once. So baby please take this & run with it. I will show you a better person. I love you. I don't like fighting Either We need to start working on the future. Had me can act to make things better. I was tripping baby. I'm ready now. I know where my heart is. I will be waiting for you. Faithfully. Everything I've done, I told you. That's also real. I just hope I hope you love me & want to be with me like you say. I will be so heart broken. So please don't fuck over me. Baby today is thursday I can't wait to talk to you in the morning. So I can tell you how sorry I am, How much I love you. I tried to stop being so damn insecure. I hate Yright. Tatas isn't. Baby that hurts me. I see that I will break down. How could you do that to me. I really don't want to get your name I because you know that. That's why. You never tried off. Real son. I'm have to act sensitive. Baby, I need to marry you. I'm ready to be Mrs. Tickas. On my work badge they put Ticlas. I like them I was married. Baby you are my everything. We've been through so much shit. I'm glad it's over. Now we can relax. Woulda said true. Faithfully. When you come home I will make it all up to you I promise You. But I will be the best mother to my kids. One last thing to you. we will do things

A little different than the usual. I love you always Sherman. I miss the hell out of you, baby. I hope to see you real soon. Call me too! Until next time, Stay strong & sweet. You will be in all my prayers sweetie.

Your wife

Shalaykea Jordan

Shalaykea

Hugs & kisses

Love you

Sherman

Forever and always
Until death do
us apart

Love you

Bye - Bye
Baby

PS. I love you, I could never tell you so much. I love you. I miss you so so much. Hurry up and come home baby I need you.

Song: Incomplete
Artist: Sisqo

7-9-01

Hey my precious prince!

I'm glad to hear you calmed down. I know I said some pretty file shit the other day. Somethings I know I hurt you. I didn't mean it baby. I was relieved to get this letter from you. [I was glad to receive it]. You made me feel so better on the inside. I was so afraid of you doing something to get back at me. I am sorry. You better call me. I'm not going to fuck off my money! Baby, I did tripout starting that same shit again. I promise I'm not going to fuck with anyone. I haven't even been to Killeen. From now on I'm not going to tell no more lies. You say you through and you better be. You need to find somebody to get that shit off you. I'm going to get your name on my neck when I get paid. Next Monday. So you need to make some arrangement for that. You are going to be my husband. I'm getting your name ASAP on my neck, Mrs. Sherman Fields. So if you playing with me, stop. I don't want to make any more mistakes. I already told you, I let somebody get you once, but never again will I. I love you with all my heart and soul. So please baby, let's do this, me and you. I miss you baby. I know I need to control my temper. But I let so much shit slip by me, not knowing about it. It's not going to happen again. Everybody say I'm stupid because you going to be with ole girl. But I hope we make them out of a lie. I want you. I have you. " Ain't no stopping it!" Yea, I know it's like obsession. You haven't seen nothing yet. I can't begin to explain how deeply I love you. Baby, now, I haven't been doing anything but trying but trying to see how we gone do this. I know as of today you have my all. That's real. Don't fuck over me Sherman. I've done so much for you within this last year. All I have been is good. Besides a few misdemeanor ass mistakes. I never cheated on you. Not once. So baby please take this and run with it. I will show you a better person. I love you. I don't like fighting either. We need

to start working on the future. What we can do to make things better. I was tripping baby. I'm ready now. I know where my heart is. I will be waiting for you <u>Faithfully</u>. Everything I've done, I told you. That's also real. I just hope hope you love me & want to be with me like you say. I'll be so heartbroken. So please don't fuck over me. Baby today is Thursday I can't wait to talk to you in the morning. So I can tell you how sorry I am, How much I love you. I need to stop being so damn insecure. It's hard. You got tatoos & shit. Baby that hurts me. If I see that I will break down. How could you do that to me. I really don't want to get your name because you have that. That's why you need that off. Real soon. You have to do something. Baby I need to marry you. I'm ready to be Mrs. Fields. On my work badge it say Lakie Fields, I told them I was married. Baby you are my everything. We've been through so much shit. I'm glad it's over. Now we can relax. Wait on each other Faithfully. When you come home I will make it all up to you. I promise you that. I will be the best mother to our kids, the best wife to you. We will do things a little different than the last. I love you always Sherman. I miss the hell out of you, baby. I hope to see you real soon. Call me boo! Until next time stay strong & sweet. You will be in all my prayers sweetie.

Your Wife

Shalaykea Fields

Bye-Bye

Baby

Shalaykea

Hugs & kisses

Love You

Lots of
Love

Sherman

Forever and always
until death do
us apart

P.S. I love you, I can't never tell you to much. I love you I miss you so so so much. Hurry up and come home baby I need you.

knew that that was done then.

And the other question concerns what the Court would require in the way of information to issue a writ of attachment or a material witness warrant for a witness that -- I've been advised by -- Mr. Youngblood, who's in the courtroom, has told him one story and the government gave the name of this witness as Brady material and said that she knew something exculpatory. He went back to her. She then admitted to the investigator she told him a lie and that the truth was she didn't have exculpatory information. She told him that, but then she said, "I'm not talking to you. I'm not going to accept any subpoenas. I'm not coming to court." And he's tried to serve her now four or five times. And we just need to know what the Court would need in order to issue a writ of attachment for that witness if we're unable to get her in otherwise.

THE COURT: Can you enlighten me somewhat on what her testimony might be?

MR. PETERSON: Yes, sir. Her testimony is going to be that one of the star government witnesses in this case, Shalaykea Scroggins, had a heated exchange in words and a motive to have done harm to the victim in this case. And the defense -- one of the defenses in this case is -- or in Mr. Fields' defense if he represents himself and part of our defense is going to be that he did not commit the murder that he's been alleged of but Shalaykea Scroggins did do so because

of the motive of the ill will she bore towards the victim because they were competitors for Mr. Fields' attention or affection.

THE COURT: Okay. Is her location something that should be -- could she be readily located by the marshals?

MR. PETERSON: If I may ask Mr. Youngblood to respond to that.

THE COURT: Sure.

MR. PETERSON: Mr. Youngblood, if you'd step forward.

MR. YOUNGBLOOD: Your Honor, she has a current City of Waco address, 2513 South 26th Street. I've made contact with her in the past at that location. I talked to a black male at that residence yesterday who indicated that that was her residence and she contacted me as per a business card I gave her. Also I spoke with her mother last night at that location indicating that she did live there but she was not going to be there yesterday evening.

THE COURT: So you've spoken to her on the telephone but not in person?

MR. YOUNGBLOOD: Not in person at this time.

MR. PETERSON: In the past he has.

MR. YOUNGBLOOD: In the past I've spoken to her in person.

THE COURT: Well, I don't understand why you don't think that she could be served with a subpoena at some point between now and the time she'd be needed, which wouldn't be next week,

I wouldn't think.

MR. YOUNGBLOOD: Well, the only thing she's indicated she's not going to be here and she's not going to accept and she's going to be --

THE COURT: Well, I don't know what you mean by "accept."

MR. YOUNGBLOOD: Well --

THE COURT: If she's served with a subpoena, she's served with a subpoena. She doesn't have an option to accept it or not, if I'm correct.

MR. YOUNGBLOOD: That's true, sir, but her appearance --

THE COURT: So you're saying she's not going to comply with it?

MR. YOUNGBLOOD: That's my belief that she will not comply with it.

MR. PETERSON: Your Honor, if I may.

THE COURT: Thank you, Mr. Youngblood.

MR. YOUNGBLOOD: Okay.

MR. PETERSON: Our intent was to ask Mr. Youngblood to continue to serve her. Then after she's served if she didn't appear as instructed in the subpoena that then we would then come to the Court and request the writ of attachment and I wanted to bring this to the Court's attention that it was an issue.

THE COURT: Well, doing it in that course of events would be completely normal. If somebody doesn't comply with a

Cross-Examination of Shaylakea Scroggins by Mr. Fields-1626

MR. SNYDER: Your Honor, I object to that question unless he can show some basis on how this witness would know what someone else did.

THE COURT: Sustain the objection.

(Conference between Mr. Peterson and Mr. Fields)

BY MR. FIELDS:

Q. Do you recall on November the 5th, 2001 the phone company calling you while me and Shining Star was on the other end of the line?

A. Yes.

Q. And isn't it true that Star told the phone company that you, whom was my ex-girlfriend, went and got your phone cut on in my name and you calling her house threatening her?

MR. SNYDER: Your Honor, Your Honor, I object. First of all, this is hearsay, and, second of all, he's simply testifying under the guise of asking a question.

THE COURT: Sustain the objection.

BY MR. FIELDS:

Q. Ms. Scroggins, did the phone company cut your phone off?

A. No, sir. They didn't.

Q. They didn't?

A. No.

Q. On November the 5th?

A. No. They didn't.

Case: 18-3389    Document: 1-1    Filed: 11/07/2018    Pages: 102

CASE# 01-8754
DATE 11-26-01        PAGE 2 OF 5

STATEMENT OF:

Sherman was becoming impaitent. So HE had ME call Trayboy again. I called and told Trayboy that Sherman said to hurry. Trayboy said, to tell Sherman HE was getting him some food becaus HE thught he might be hungry. So I hang up. I told Sherman. About 5 minutes later Tray Boy pulled up with Renee Hampton in the car with him. They had McDonalds Sacks in there hand. We all went into the room. I noticed Sherman had a change of clothing in his hand + a small silver hand gun. HE was messing with the bullets. I told him I was ready to go. HE said o.k. As soon as Trayboy take him to get another car HE would come back and get me. So ME + Sherman got back in the car. Trayboy + Renee got back in theres. We was suppose to follow them to renee's apartment in the villages on 6th street. Instead Sherman let me out on 9th & he left. About 3 minutes after that Trayboy pulled up & ask where was Sherman. I replied, I don't know I thugh he was with you. Tray boy said, Im going to see if I can find him, I will call you later. I went into my sisters house. She had told me that she was glad to see me. I walked to the store around the corner

WITNESS: _____

WITNESS: _____

Shalaykea Scroggins
SIGNATURE

FIELDS 014216

CASE# D1-8754
DATE 11-26-01          PAGE 3 OF 9

STATEMENT OF:

To get smething to drink + a box of Black & milds. When I came back my sister told me. Trayboy called and said he couldnt find Sherman. He hope he didnt do what he said He was going to do. My sister (Shekie) said that Sherman told Trayboy He was going to fuck Shining star off. Trayboy didnt want her too tell me. So I didnt ask him about it. About 1:30 a.m Sherman called me from the motel we were at earlier. I asked him where had he been, he said just riding. While we were talking I heard him or something scraping. I ask what it was, but he said he dont know what I was talking about. He told me he was going to go get Trayboy so He can drop us back off at the room. So about 20 minutes later they picked me up. I noticed Sherman was dressed different. He had on a different shirt. Pants. The same orange+white shoes. when we got out. Trayboy named Sherman $50. That was to check in the room again the next day. So we went in the room. He took a shower and got in the bed. He ask me if I would put those shoes in the trash. The orange shoes. He had some more. Some black ones. I threw them away & while sacked the clothes he had put in the trash. left them sitting where the room service lady could get them.

Shalaykea Scroggins
SIGNATURE

WITNESS: _____

WITNESS: _____

FIELDS 014217

Shalaykea Scroggins Grand Jury testimony.                    22

Q.   And where did he tell you he was going?

A.   He was supposed to follow behind --

Q.   To trade cars?

A.   -- Trey Boy. Yeah, I was just getting out. You know, he was still following, and I told him to go ahead and let me out and --

Q.   Now about what -- what time is this taking place?

A.   This about --

Q.   Are we at eleven o'clock yet?

A.   Yeah, right at 11:00.

Q.   Okay.

A.   Probably right at 11:00.

Q.   So he dropped you off, and where do you go?

A.   And I went to my apartment --

Q.   Okay.

A.   -- and I stayed there for about five minutes and -- no, probably about ten, and Trey Boy came and knocked on my door. He asked me, "Where did Sherman go," and I said, "I don't know where he went; he was supposed to follow behind you." He was like, "Well, I don't know where he at," and I was like, "Well, I don't know where he at because" -- you know, and I was like -- so he told me that he was going to go over to his house -- to his apartment with my sister, and if I

Shalaykea Scroggins Grand Jury testimony.                    23

heard from him or if he came by to call him and let him know --

Q. Okay.

A. -- so this is like 11:00, and I -- I went to my sister's apartment, and I --

Q. To Sheekie's?

A. Yeah, to Sheekie's, and I went to sleep. I got a phone call. It was Sherman about probably 1:00, maybe 2:00. I'm not exact of the time.

Q. Sometime between 1:00 and 2:00 in the morning?

A. Between 1:00 and 2:00, and he called from the New Road Inn, and he asked me what was I doing, and, you know, I was like, "What are you doing," and he was scraping on something in the background. I don't know what it was, but I just keep hearing a scraping sound, and I asked myself, "What is you doing, are you scraping on" -- "it sounds like you're scraping something." He was like, "Girl, I don't know what you're taking about; I'm not scraping nothing, so it must be on your" -- "your phone line," and I was like, "No, you're scraping something, or you're bothering something." He didn't say nothing, and I was like, "Well, where have you been," and he say he rode around -- he had to go hit a lick. He hit a lick. That's how he used it.

A.    Yes.    That was right after he got out.    As soon as we left Alberta's apartment, he called Suncerey Coleman, Shining Star, on my cell phone when we was on our way to Proctor to tell her that he would be out there in about ten minutes, for her to come outside.    He'll be out there to pick her up and talk to her in about ten minutes.

Q.    Did you go to the hospital?

A.    No, sir.

Q.    Not only then, but any time that night did you go to the Hillcrest Hospital?

A.    No, sir.

Q.    Let's go back to the motel for a minute.    After you left the motel, who was in the car and who was following whom?

A.    After we left the motel, we wasn't really following one another then.    I got in the Jaguar.    Me and Alberta Hampton got in the Jaguar and left and him and Shalaykea had got in the Grand AM and left.

Q.    And where did you go?

A.    I went and took Alberta back to the house and basically was working off my phone going to some of my customers selling crack bites.

Q.    You were selling crack?

A.    Yes, sir.

Q.    And also, sir, is -- you also work, if you will, with

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
REPORT OF INVESTIGATION

Page 1 of 2

| ADDRESSED TO:<br>Special Agent in Charge<br>Houston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Houston Field Division<br>FY-04<br>Report 020 |
|---|---|

| TITLE OF INVESTIGATION:<br>FIELDS, Sherman Lamont | |
|---|---|
| CASE NUMBER:<br>782010-02-0042 | REPORT NUMBER:<br>20 |

TYPE OF REPORT: *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY (Name)<br>Douglas J. Kunze | SUBMITTED BY (Title and Office)<br>Special Agent, Waco Satellite Office | SUBMITTED BY (Date)<br>12/18/2003 |
|---|---|---|
| REVIEWED BY (Name)<br>Mark W. Curtin | REVIEWED BY (Title and Office)<br>Resident Agent in Charge, Waco Satellite Office | REVIEWED BY (Date) |
| APPROVED BY (Name)<br>Donnie A. Carter | APPROVED BY (Title and Office)<br>Special Agent in Charge, Houston Field Division | APPROVED BY (Date) |

DESCRIPTION OF ACTIVITY:

Interview of Lutrill Amos PAYNE.

SYNOPSIS:

On October 28, 2003, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (S/A) Douglas J. Kunze interviewed Lutrill Amos PAYNE (DOB 9/14/70) at 6801 Sanger Avenue, Waco, Texas in reference to this investigation.

NARRATIVE:

1. On October 28, 2003, S/A Kunze interviewed Lutrill Amos PAYNE (DOB 9/14/70) at 6801 Sanger Avenue, Waco, TX.
2. S/A Kunze explained the reason for the interview with PAYNE was to determine if he owned a Jaguar vehicle and had rented it to anybody in the past. PAYNE was also asked if he remembered renting any motel rooms for an individual in the past.
3. PAYNE stated that he did remember an incident because that was the only time he remembered renting a motel room. It was either in the spring or fall between 1999 and 2001.
4. At the time, he was going to a house at 4th and Proctor in Waco. It was a drug house and the "house guy" (lived in the house) was named Walter Last Name Unknown (LNU). PAYNE described Walter as a black male, 40s to 50s, approximately 5'9" tall, weighing about 180 pounds with a mustache or goatee.
5. PAYNE believed Walter's last known address to be a house on 13th or 14th behind West Elementary School in Waco. Walter was the 'house man' there as PAYNE bought 'crack cocaine' there in the recent past.

| | |
|---|---|
| DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>REPORT OF INVESTIGATION | Page 2 of 2 |

| | |
|---|---|
| ꝰRESSED TO:<br>ꞓecial Agent in Charge<br>ꞓuston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Houston Field Division<br>FY-04<br>Report 020 |

| | |
|---|---|
| ꞮTLE OF INVESTIGATION:<br>ꞮELDS, Sherman Lamont | |
| CASE NUMBER:<br>782010-02-0042 | REPORT NUMBER:<br>20 |

6. When asked how recent, PAYNE stated that he did not want to answer that because he was on State probation and under a motion to revoke from Bell County, TX. PAYNE said he was on probation for burglary of vehicle in Killeen, TX.

7. PAYNE explained that the 'house man' was paid a small amount of money or drugs for allowing the drug dealers to use their house.

8. PAYNE stated that he remembered buying a large amount of 'crack' and renting his Gold Jaguar to a 'crack' dealer. He described the dealer as a black male, under 30 years of age, 5'8" to 6'0", medium afro hair, dark skin, weighing 175-180 pounds. He did not know the dealer's name or street name as he bought from whoever was dealing at the house at the time.

9. He said he never got anything for the car rental because the dealer was supposed to come by later and never showed up. The dealer asked if PAYNE would rent a motel room in his (PAYNE's) name. PAYNE stated that he went with the guy to a nicer, cheap motel on Interstate 35 in Waco. The guy gave PAYNE money for one (1) night and PAYNE rented the room in his name.

10. PAYNE went back to Proctor with the guy and let the guy take his Jaguar. PAYNE believed that an hour or so later another guy came up to him at the house on Proctor. PAYNE was not sure but the guy may have been Walter. The guy said to walk down two blocks to another house. He said another hour or so after that a black male brought his Jaguar back. PAYNE did not believe it was the same guy he originally rented the Jaguar to earlier.

11. S/A Kunze told PAYNE that this interview was related to the investigation of Sherman FIELDS. When asked if he had any further information about FIELDS, PAYNE said he had a conversation with a Marvin POWELL in the McLennan County Jail about September 2003.

12. POWELL told PAYNE that he saw FIELDS during the time he had escaped. POWELL supposedly gave FIELDS $100 and went for a ride with him. POWELL had a firearm in the car and FIELDS took the firearm when the Waco PD chased them.

ATF EF 3120.2 (5-98)

# LENNAN COUNTY SHERIFF'S OFFICE
# JLLOW-UP REPORT

MCLENNAN COUNTY
SHERIFF'S OFFICE
219 N 6TH
WACO, TX 76701
254 757-5108

Case No.    01-8754
Report No.   01-8754.28
eport Date:  11/29/01

Page 1 of 1

**1**

| | | | | | |
|---|---|---|---|---|---|
| Subject: | HOMICIDE | | | | Reporting Officer |
| Case Report Status | I - IN PROCESS | Date Entered | 11/29/01 9:27:59 AM | | 1825 COLYER, MORRIS |
| | | Entered By | 0023 - WILLIS, TAMMA | | |
| Occurred On | 11/21/01 5:22:00 PM | Date Verified | | | |
| (and Between) | | Verified By | | | |
| | | Date Approved | | | Assisted By |
| Location | JERICHO LANE (BETWEEN HILLIARD LN & ESTELLA LN) | Approved By | | | |
| Census/Geo Grid | G4 - GRID 4 | Connecting Cases Disposition | ACTIVE | | |
| Call Source | OFFICE | Clearance Reason | | | |
| | | Date of Clearance | | | |
| Vehicle Activity | | Reporting Agency | MCLENNAN COUNTY SHERIFF'S OFFICE | | |
| Vehicle Traveling Cross Street | | Division Notified | CID | | |
| Means Other Means Motive Other Motives | | | | | |

Report Narrative

ON 11-27-01, MYSELF AND DET. SPILLMAN DID GO TO HWY 6 JAIL TO SPEAK WITH EDWARD OUTLEY III, AKA TREY BOY. DET. SPILLMAN DID READ OUTLEY HIS MIRANDA WARNINGS AND WE DID BEGIN TO DISCUSS SHERMAN FIELDS.

DURING THE COURSE OF OUR DISCUSSION OUTLEY DID TELL US THAT HE RENTED A RED GRAND AM BELONGING TO ROGER THOMISON ON THE SAME EVENING FIELDS BROKE OUT OF THE CIVIGENICS JAIL AND ON THAT SAME EVENING OUTLEY TOLD US HE SAW FIELDS A COUPLE OF TIMES. OUTLEY SAID HE SAW FIELDS AT THE NEW ROAD INN WITH SHALAYKEA SCROGGINS. OUTLEY ALSO TOLD ME THAT WHEN THE RENT TIME WAS UP ON THE GRAND AM HE RENTED A BLUE JAGUAR AND GAVE THE KEYS TO THE GRAND AM TO ALVIN FIELDS, AKA BIRD, B/M, DOB 5-13-82.

AT THAT POINT I ASKED TREY BOY IF RENTED THE CAR FOR FIELDS AND HE SAID THAT WHEN HE GAVE THE KEYS TO BIRD HE KNEW THAT SHERMAN WOULD TAKE POSSESSION OF THE CAR AND THAT IS THE REASON HE GAVE THE KEYS TO BIRD.

I HAVE NO FURTHER INFORMATION.

---

ffense Detail: 0911 - HOMICIDE - WILLFUL

| | | | | |
|---|---|---|---|---|
| Offense Description | 0911 - HOMICIDE - WILLFUL | Location | 13 - HIGHWAY/ROAD/ALLEY | |
| IBR Code | 09A - MURDER AND NONNEGLIGENT MANSLAUGHTER | | | |
| | | Offense Completed? | YES | No. Prem. Entered |
| IBR Group | A | Hate/Bias | 88 - NONE (NO BIAS) | Entry Method |
| Crime Against | PE | Domestic Violence | NO | Type Security |
| Using | | | | Tools Used |
| Criminal Activity | | | | |
| Weapons/Force | 95 - UNKNOWN | | | |

Cross-Examination of Shaylakea Scroggins by Mr. Fields-1635

Ms. Scroggins, I'm not going to tell you again. When Mr. Snyder starts making an objection, you don't answer the question. You wait until I've ruled on it. Understand?

Go ahead, Mr. Fields.

BY MR. FIELDS:

Q. Ms. Scroggins, can we talk about this Jaguar for a moment? What color did you say it was?

A. Blue.

Q. It was blue?

A. Gray blue. Light blue.

Q. All right. Ms. Scroggins, how do you confuse blue with gold?

A. Gold?

Q. Yes, ma'am.

A. Where do gold come from?

Q. I'm just asking you, how do -- how do you confuse blue with gold?

MR. SNYDER: Your Honor, this -- this is not a proper question.

THE COURT: Sustain the objection.

BY MR. FIELDS:

Q. Ms. Scroggins, isn't it true that you, your sister and Outley conspired to intentionally change the color of the Jaguar because you knew if they found that Jaguar they would then find enough physical evidence to run forensic testing on?

Direct Examination of Lutrill Payne by Mr. Fields——1936—

MR. GLOFF: Nothing further, Your Honor.

THE COURT: You may step down.

MR. FIELDS: The defense calls Mr. William Young.

(Conference between Mr. Fields and Mr. Swanton)

MR. FIELDS: Your Honor, can they stop him from getting that witness because one of our other witnesses is back.

THE COURT: Which one do you want?

MR. FIELDS: The one out there first.

THE COURT: Who's that?

MR. FIELDS: The defense calls Mr. Lutrill Payne.

(The witness was sworn)

DIRECT EXAMINATION

BY MR. FIELDS:

Q. Mr. Payne, would you state your name and spell it for the court reporter?

A. Lutrill Payne, L-u-t-r-i-l-l, Payne, P-a-y-n-e.

Q. Mr. Payne, I want to direct your attention to the night of November the 6th, 2001. Do you recall renting your car out to an individual?

A. Sir, at that particular time I was a drug user. A lot I don't recall. Particular nights are fuzzy with me.

Q. But you do rent your car out, correct?

A. I have done that before, sir.

Q. Mr. Payne, what color is your car?

A. It's a Jaguar, gold, sir.

Cross-Examination of Lutrill Payne by Mr. Snyder——1937

Q.    It's a gold Jaguar?

MR. FIELDS:   I pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. SNYDER:

Q.    Did your daddy used to have a Jaguar?

A.    Yes, sir.

Q.    What color was it?

A.    Blue.

MR. SNYDER:  Nothing further.

REDIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Payne, do you also rent your daddy's Jaguar out?

A.    Sir, my father was killed in 1998 in his Jaguar.

Q.    And the Jaguar was totaled or something?

A.    Sir, he was killed in that car and that car was totalled.

Q.    So on November 2001 you only had the gold Jaguar correct?

A.    Yes, sir.

MR. FIELDS:   I have no further questions.

RECROSS-EXAMINATION

BY MR. SNYDER:

Q.    But a lot of people knew and saw you in the blue Jaguar, right?

A.    No, sir.

Recross-Examination of Lutrill Payne by Mr. Snyder——1938

Q.   But people had seen it, correct?  You were living with your parents?

A.   Yes, sir.

Q.   And people had seen it?

A.   People may.  Sir, my father had the car for a short time before he was killed in it.

Q.   And, oh, by the way, is -- it was the government that tracked you down, correct, and first came and talked to you about this?

A.   Yes, sir.

MR. SNYDER:  Nothing further.

THE COURT:  You may step down, sir.

MR. FIELDS:  Your Honor, can I ask him one more question?

THE COURT:  All right.

FURTHER REDIRECT EXAMINATION

BY MR. FIELDS:

Q.   Mr. Payne, when the government tracked you down, wasn't it because they got your name off a ledger at a motel?

MR. SNYDER:  Your Honor, not only is that argumentative, but that is just blatantly false.

THE COURT:  It's argumentative.  Sustained.

MR. FIELDS:  I have no further questions, Your Honor.

THE COURT:  You may step down, sir.

THE WITNESS:  Thank you, sir.

MR. FIELDS:  The defense calls Mr. William Young.

# SCOTT PETERSON
## ATTORNEY AT LAW

BOARD CERTIFIED, CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
STATE BAR OF TEXAS

1701 AUSTIN AVENUE
WACO, TEXAS 76701-1741

TELEPHONE (254) 753-3100
TELEFAX (254) 753-5122

February 28, 2002

*March 4th*

Sherman Lamont Fields
McLennan County Jail
3201 E. Highway 6
Waco, Texas 76705

RE:     State of Texas v. Sherman Lamont Fields
        Case No. 2002-0050-C

        U.S.A. vs. Sherman Lamont Fields
        Case No. W-01-CR-114

Dear Mr. Fields:

Enclosed is a copy of the state district court's notice that your aggravated assault case has been set for trial on *Monday, May 20, 2002 at 9:00 a.m.* I spoke with the prosecutor about this case to see if he still planned to take it to trial but he was non-committal. I have learned that LaDon King is in prison and they know he is not a very credible witness against you. I must, however, continue to treat the charges against you seriously as the state has other witnesses and the case is set for trial.

With regard to your federal charges, both the escape case and the felon in possession of ammunition and firearm cases are set for trial on *Monday, March 25, 2002 at 9:00 a.m.* The last time we spoke you indicated that you wanted a trail on each case so I have not requested that your cases be removed from the trial docket to the plea docket.

Please recall that both the state and federal prosecutors have mentioned to me that you may be indicted for carjacking and for murder or capital murder. They are unwilling to make any kind of deal on all of these cases at this time, but they are still interested in talking to you. They just are not willing to make any deals. I do not see how talking to them could help you if you intend to go to trial and are not interested in making a deal. I have recently learned from a local attorney that they prosecution is seeking "jailhouse testimony" from certain individuals who you may have shared a cell with in the past. I know you are now in isolation but please do not talk about your cases with anyone.

I will be out of town next week but plan to visit you personally the week of March 11th.

Sincerely,

Scott Peterson

SP/jsp
Enc.

$iR* Edward Lee Outley III "Tray Boy"

MR* Scott Peterson

RE* IN SUPORT OF Sherman Fields * As to Any Unknown Statements That You Have *
Supposely Been Written By Me * "$iR* Edward Lee Outley III "Tray Boy" ***

DEAR SCOTT,

I am Writing you Today Concerning These Unknown Statements * That you Have and
I Suposely Have Written * Sherman Fields Is Telling Me That You Have Some Statements That
I Wrote * I Have Not Wrote One Statement On Sherman Fields * I Wrote A Statement
Clearing My Name From Any And All Charges Pending Me * I Did Not Do No Wrong
And I Was Not Gone Sit Back And Not Clear Myself * They Said That I Gave Sherman
A Firearm * But Thats A Lie That I Refused To Testify To * I Did Not Give Sherman Any
Thing * Sherman Also Wanted you To Get A Copy Of Shalaykea Scroggins Letter From Me
It's A Letter Thats In My File Stating That They Want One Of Us To Say We Was With
Sherman * MR* Scott, I Was Not With Sherman, I Did Not Give Sherman Any Thing *
And They Gave Me Eight Years, Because I Would Not Lie Saying That I Did * I Could
Have Got A SKI But I Didn't Give Sherman Any Thing And Don't Need No Time Cut
I'm Not Sure Reather Are Not I'll Have To Testify At Sherman's Trial * But I Do Know That
All The Statement You Have * Were Not Written By Me, And I'm Not Gone Lie On Sherman ***

SINCERELY,
$iR* Edward Lee Outley III "Tray Boy"
$iR* Edward Lee Outley III "Tray Boy"
$iR* Edward Lee Outley III

CC* 10/20/02

Sherman L. Fields



JEREMY GLOER
NOTARY-PUBLIC
State of Texas
Comm. Exp. 05-08-2006

Direct Examination of Chance Alexander by Mr. Fields

DIRECT EXAMINATION

BY MR. FIELDS:

Q.   Mr. Alexander, --

A.   Yeah.

Q.   -- would you please state your name and spell it for the court reporter?

A.   Chance Alexander, C-h-a-n-c-e A-l-e-x-a-n-d-e-r.

Q.   Mr. Alexander, first, do you know who I am?

A.   No.

Q.   Mr. Alexander, at one point you went to the -- to law enforcement and told them that you had knowledge about this murder; am I correct?

A.   No.   They came to me and asked me did I know of him.

Q.   Oh, they came to you?

And at this time did you tell them anything specific?

A.   I told them -- they told me somebody knew about it. Somebody told me about it, that I was there with you talking to you.

Q.   And did you tell them that you'll cooperate or something for a deal or something?

A.   No.   It wasn't -- it wasn't just like that, but they told me they'll let me out of jail if I -- they get me out of jail if I told them about you.

Direct Examination of Chance Alexander by Mr. Fields—1931

A. I don't know you at all.

Q. But did you tell them you know me?

A. Yeah.

Q. And your purpose for telling them that you knew me was so that you could get out of jail; am I correct?

A. Yeah.

Q. And you're on the government's witness list; am I correct?

A. I don't even what that is.

(Conference between Mr. Fields and Mr. Swanton)

BY MR. FIELDS:

Q. But, Mr. Alexander, for some reason you didn't testify; am I correct?

A. Say that again.

Q. For some reason you chose not to testify; am I correct?

A. I don't even understand what you're trying to say.

Q. I'm saying for some reason did you choose not to testify against me for the prosecutors?

A. Yeah. I've been -- told them that I made that up.

Q. That you made it up?

A. Yeah.

MR. FIELDS: I pass the witness, Your Honor.

CROSS-EXAMINATION

present at the time and also a gentleman that was asleep named Cream which was the actual father of the child that Suncerey had just had.

Q.  And that child was premature and was in the hospital?

A.  Yes, sir, and she was taking -- she was there taking classes for post-natal care for -- for a premature child --

Q.  Okay.

A.  -- and he came in.  He picks up Cream's cell phone -- cellular phone and starting scrolling through the numbers and -- and at this time became very irate told her that he needed to talk to her outside, which she did leave with him.  At this time Taniesha Hillard also realized that Suncerey had money that belonged to her that was in -- in her pocket, and she wanted it back.

Q.  In Suncerey's pocket?

A.  Yes, sir, so she went down in -- into the lobby and -- and called them, and she was able to get her money back, and at this time Suncerey and -- and Fields left in the red Grand Am.

During this time my -- my agency -- several agencies was -- was already notified of the escape.  The original -- actual original report was

phone call to the room. He comes back and enters the hospital and goes into the actual room where they are in the IC -- neonatal ward, I think, on the third floor.

In the room is the father of this infant. He is asleep on the bed in the hospital. It's one of these rooms where families can stay. Also in the room is a lady by the name of Taniesha Hillard. She is a relative of Fields, third or fourth cousin down the line. She, coincidentally, also is an employee of the Civogenics jail, the downtown detention facility, who according to her report to us was on maternity leave at if time. She's in the room, and then, of course, you have Suncerey Coleman, a/k/a "Shining Star," in the room.

The father of the baby, a/k/a -- his nick -- his street name is "Cream." I believe his first -- oh, God, I forgot his first name now. Anyway, he is on the bed asleep. Sherman Fields goes into the room, looks at his cell phone, apparently sees numbers on the man's cell phone that he recognizes, becomes apparently, according to -- according to Ms. Hillard, angry. He and Suncerey Coleman leave the room to get --

Q.   Mr. Fields and --

A.    No.

Q.    Have you ever known me to act violent towards Shining Star?

A.    No.

Q.    Was I upset when I came to the hospital either the first time or the second time?

A.    No.

Q.    Have you ever heard me say that I thought Star's baby was mine?

A.    No.

Q.    Isn't it true that I knew Star's baby was by Cream?

A.    Yes.

Q.    Ms. Hilliard, do you know why Star's baby was born premature?

A.    No.

Q.    Isn't it true that Star drunk liquor and vinegar in an attempt to abort --

MR. GLOFF:  I'm going to object to that.  That's irrelevant.  She said she didn't know.

THE COURT:  Sustained.

BY MR. FIELDS:

Q.    Ms. Hilliard, isn't it true that Star and I made jokes about the issue -- the whole issue of her and Cream?

A.    I don't know.

Q.    Do you remember Star making a statement, quote, "I

A. Yes, sir.

Q. You said in your grand jury statement first when I came to the hospital me and Shining Star was -- well, I'm going to quote you. You say, first him and Suncerey was talking. She sat --

MR. GLOFF: Your Honor, I object to him reading from a document. Is he trying to impeach the witness?

THE COURT: Sustain the objection.

You can't read from a document that's not in evidence, Mr. Fields.

BY MR. FIELDS:

Q. Isn't it true that Star and I was hugging and kissing in the car?

A. Yeah.

MR. FIELDS: I have no further questions, Your Honor.

MR. GLOFF: I have just a couple of questions.

REDIRECT EXAMINATION

BY MR. GLOFF:

Q. Number one, you just said that in response to one of Mr. Fields' questions that he was playing a game between them. Explain to the jury what kind of game he was playing with them.

A. He would like -- okay. He'll tell Suncerey that he don't talk to Shalaykea or he'll tell Shalaykea he don't talk to Suncerey, but then they both -- on his visiting list they both go see him. I mean, that's a game to me. Talking to both

Page: 1 of 1          Case Number: 01- 75644

STATEMENT OF:

On 11-15-01 I had pulled into the Hilcrest hospital parking lot and started to get out of my car, when I saw a Black male approach me at my driver's side door. The Black male then told me to get back into my car, I kept getting out of my car and pushed him back away from me, he then grabbed me with his left hand around the throat and pulled out a gun with his right hand and tried to point it at me. I grabbed the gun with my left hand and tried to push it away from me, and used my right to try to fight him off, I was screaming and yelling for help the entire time. I was able to get away from his hold and run towards the back of my car, towards the hospital. The Black male then got in my car, backed up and drove off. The male drove through the back of the parking lot then up to the exit at 30th. He then drove South 30th towards Pine then turned east on Pine. I did not know who the Black male was, then one of the hospital security guards showed me a picture of a Black male and I said that was him, he said this is Sherman Fields. Officer Carriraks also showed me a pic of another Black male, and I said that was the same person the guard showed me. Officer Carrizales told me this pic of a man named Sherman Fields. I will assist the Waco P.D. with the prosecution of this case.

I will assist the WACO POLICE DEPARTMENT IN THE INVESTIGATION AND PROSECUTION of this case. I have been given the opportunity, before signing this statement, to make any additions or deletions I desire in order that this statement be accurate. I have stated all the above is true and correct and happened in WACO, MCLENNAN COUNTY, TEXAS.

Signed this 15th day of November , 200 1 .

Tammy Edwards deposition.

A. He was probably about three car lengths away.

Q. Okay.

A. And he started walking towards me and I started looking at him and looking at him closer and then once he got all the way close to me --

Q. Okay. Let me stop you there. While he was walking that three car lengths, what were you doing?

A. I had both of my feet on the ground.

Q. Were you just sitting there watching him or were you actually continuing to get out of the car?

A. Actually, I was sitting there waiting for him to just pass so I could get out of my car.

Q. Was there another car next to you or was it open?

A. No, there was another car next to me.

Q. Okay.

A. And I was sitting there waiting for him to pass so that I could get up and go to work and he just came closer to me and closer. And then for a moment before he even got all the way up on me, I thought he was just going to ask me the time at first.

Then when he got close to me, it went off in my head like an alarm that that was Sherman Fields. We've had his picture posted all over Hillcrest. That was Sherman Fields. So I stood up, just abruptly just stood up.

Tammy Edwards deposition.

hand raise and he raised his hand like that.

Q. Okay.

A. And I ducked.

Q. Did you hear anything?

A. I heard a gunshot. And then I saw him sped away in my car and he almost hit this girl and that's when I got up and ran across the street and all the people in the world showed up then. Nobody was there when I needed them.

And then when I got across the street, there was Darrell Hodges that works in the warehouse. I ran up there and I knew him so I hugged him and I just started crying.

Q. Okay. Do you know -- if he shot at you, did it hit the -- did the bullet hit something?

A. No.

Q. Any car windows?

A. I think it was just air but I don't know what it hit, no.

Q. How full was the parking lot?

A. There was a lot of cars there because it was seven o'clock. It was seven o'clock shift, you know. You relieve the night shift.

Q. Okay. And so you said you went -- when you ran toward the trunk of your car. Right? Did you cross over

```
==============================================           | SUPPLEMENT
                W A C O   P O L I C E   D E P A R T M E N T   | Report
                        WACO, TEXAS
===============================================|=====================
                                    Case: 01-075644 (003)PAGE: 1 of 2
Reported Date: 11/15/01  Time: 07:35  Crime: AGG ROBBERY  Class: 030110
Code: 29.03 1F PC                        Day: THURSDAY -          Time: 07:30-07:35
Occurrence Date: 11/15/01-          Closing Officer: 000201 JANUARY S
Status: AC  ACTIVE INVES                                         RD:  335
Location: 3000 HERRING, WA
          PARKING LOT
===================== NARRATIVE ===============|=====================
```

On 11/28/01 on coming to work, I found inside the Waco PD Laser Lab at 721 N. 4TH was a GRAY CHEVROLET LUMINA, 4DR, with TX tags D95MFG. I contacted ID TECH SANDERS, who put the vehicle in the lab and he told me DET. JANUARY found this vehicle which was used in an AGGRAVATED ROBBERY and requested printing of the vehicle to see if any prints could be found. On processing the outside of the vehicle, found a lot of water marks, some smudging, no good ridge detail on the inside. On dusting the inside of the trunk area, I found a set of plates that were F84KRK. On running the 28 on these plates, it came back to this 1999 CHEVROLET LUMINA. The plates that were on this vehicle were one rear plate being D95MFG. This also comes back to a 1999 CHEVROLET, but not with the same VIN# of this LUMINA. This one plate that did not belong to the vehicle was removed and printed. Results will be further in this report. The two plates that were found in the trunk area that belonged to this vehicle; one was put on the back and the other one was left in the sack in the trunk area. Also, there was a FORD key with a remote key ring on it. This will also be taken and placed in the property room as evidence. The inside of the vehicle, the windows and the mirrors were fingerprinted with the following results:

CARD # 1 - PRINTS FROM THE INSIDE DRIVER'S SIDE WINDOW

CARD # 2 - PRINTS FROM THE INSIDE DRIVER'S WINDOW, AFIS QUALITY

CARD # 3 - INSIDE BACK RIGHT PASSENGER WINDOW. APPEARS TO BE A PARTIAL
           PALM

CARD # 4 - AFIS QUALITY PRINTS FROM THE INSIDE DRIVER'S WINDOW

CARD # 5 - PRINT OVER PRINTS FROM INSIDE DRIVER'S WINDOW

CARD # 6 - PRINT OVER PRINTS. SOME OF THESE DO SHOW GOOD RIDGE DETAIL FROM
           THE INSIDE DRIVER'S WINDOW

CARD # 7 - VERY LIGHT PRINTING FROM THE INSIDE DRIVER'S WINDOW

CASRD # 8 - PRINT OVER PRINTS, SOME RIDGE DETAIL FROM THE INSIDE BACK
            PASSENGER WINDOW BEHIND DRIVER'S SEAT

CARD # 9 - TWO SMUDGE PRINTS FROM INSIDE BACK LEFT PASSENGER WINDOW BEHIND
           DRIVER

CARD #10 - LIGHT PRINTING AND SMUDGING FROM INSIDE BACK LEFT WINDOW

CARD #11 - PARTIAL PRINT FROM BACK OF LP# D95MFG

```
                              -------------=========================
```

===============================================================
                                              | Continuation
          W A C O   POLICE   DEPARTMENT        | Page
                 WACO, TEXAS
===============================================================
                                    Case: 01-075644 (003) PAGE: 2 of 2
Reported Date: 11/15/01  Time: 07:35
Code: 29.03 1F PC        Crime: AGG ROBBERY   Class: 030110

CARD #12 - PARTIAL PRINT FROM BACK OF LP # D95MFG

The other plates that belong to the vehicle also printed, F84KRK; however,
only smudging could be detected and no prints were located. The LP D95MFG
will be placed in the property room along with the FORD KEY and the 12
print cards will be given to JOANN in fingerprints.

I notified DET. JANUARY, who was going to contact the owner of this 1999
CHEVROLET LUMINA nad have them come retrieve their vehicle from the laser
lab.

===============================================================
                                              Continuation Page
W A C O   Police Department
===============================================================
Reporting Officer: BLAIR J        Number: 000179  Date: 11/29/01  Time: 12:30
        Typed by: BROUSSARD       Number: 384     Date: 11/29/01  Time: 13:11
Approving Officer: BROUSSARD      Number: 000384  Date: 11/29/01  Time: 13:22

```
================================================                    | SUPPLEMENT
=====================================================               | Report
                W A C O   P O L I C E   D E P A R T M E N T         |
                         WACO, TEXAS                                |
=======================================================================================
                                    Case: 01-075644 (006) PAGE: 1 of 1
Reported Date: 11/15/01  Time: 07:35
Code: 29.03 1F PC         Crime: AGG ROBBERY   Class: 030110
Occurrence Date: 11/15/01-          Day: THURSDAY -         Time: 07:30-07:35
Status: AC  ACTIVE INVES           Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                                  RD:   335
          PARKING LOT
========================== NARRATIVE =================================================
```

On 11-29-01 I received twelve latent fingerprint cards from Laser lab Officer Blair. On these cards there are twelve latent lifts. I find quality of print for AFIS submission. Prints are of good eye comparison quality. Fingerprints will be entered in AFIS and remain on file in the AFIS Lab until needed.

```
                                                                    First Page
======================================================================================
W A C O    Police Department
=======================================================================================
Reporting Officer: GUERCIO .       Number: 000361   Date: 11/30/01   Time: 12:10
      Typed by: GUERCIO            Number: 361      Date: 11/30/01   Time: 12:02
Approving Officer: MCELYEA M        Number: 000387   Date: 12/03/01   Time: 08:17
```

```
=============================================================
               W A C O   POLICE   DEPARTMENT          | SUPPLEMENT
                    WACO, TEXAS                        | Report
=============================================================
Reported Date: 11/15/01   Time: 07:35   Case: 01-075644 (007)   PAGE: 1 of 1
Code: 29.03 1F PC        Crime: AGG ROBBERY   Class: 030110   CAD#:      Hate:
Occurrence Date: 11/15/01-        Day: Thursday -              Time: 07:30-07:35
Status: CA  CLEAR ADU AR          Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                             RD:  335  Beat:
          PARKING LOT
====================== NARRATIVE =============================================
On this case I was asked to do a comparison with subject, SHERMAN FIELDS,
DOB 7/14/74, and CHRISTIAN CHAE WALKER, DOB 10/11/73. On the comparison
there is no match. Latent prints remain on file in the AFIS Lab until
needed.
```

```
=============================================================
                                                      First Page
W A C O   Police Department
=============================================================
Reporting Officer: GUERCIO        Number: 000361  Date: 12/11/03  Time:
        Typed by: HUBBARD         Number: 321      Date: 12/16/03  Time: 11:05
Approving Officer: HUBBARD,BETTY  Number: 000321  Date: 12/16/03  Time: 11:07
```

Direct Examination of Steve January by Mr. Snyder——1326—

A.    Same -- same thing, fingerprinted, trace lifters, vacuuming.

Q.    And had it vacuumed and everything, correct?

A.    I believe they vacuumed it.  Yes.

Q.    And when you say vacuumed it, you're looking for trace evidence, correct?

A.    Yes.

Q.    Hairs, fibers, anything you can find?

A.    Yes.

Q.    And the results of that was this thing was clean, correct?

A.    That is correct.

Q.    Now, did you obtain a set of keys that were in evidence at the Waco Police Department?

A.    Yes.  I did.

Q.    And these keys were -- the keys had been found in the apartment on Ruby; is that correct?

A.    Yes.  It is.

Q.    And what did you do with these keys after you removed them from evidence?

A.    This particular car had -- I took the keys out of the property room is what I did.

Q.    Okay.

A.    It had an electronic chip in the key itself and -- which indicated it would only start one specific ignition.  And

Cross-Examination of Morris Colyer by Mr. Snyder——1924

MR. FIELDS: I have no further questions.

CROSS-EXAMINATION

BY MR. SNYDER:

Q. Sir, Mr. Outley later furnished the name of the person he got the Jaguar from, did he not?

A. Yes. He did.

Q. And if you would, sir, is -- did you also track down the red two door car that was being driven that evening that had been rented by Edward Outley on the evening of November the 6th?

A. Yes.

Q. And you found the person he rented it from with only the name Roger, correct?

A. Right.

Q. And that was Roger Thomison?

A. That's correct.

Q. And you went out and looked at the vehicle and caused it to be processed; is that correct?

A. Yes.

Q. And that would have been on or about November the 14th, I think?

A. Possibly. Yes.

Q. And when you looked at the vehicle, did any -- the interior of the vehicle, did anything immediately strike you about it?

Cross-Examination of Morris Colyer by Mr. Snyder——1925

A.    Well, it struck me how clean it was.

Q.    And when you say clean it was, is --

A.    It looked like it had been detailed, wiped down, however.

Q.    And did it appear as though everything, the upholstery, the carpet?

A.    The upholstery, the trunk area.

Q.    And you submitted it for trace evidence, correct?

A.    Yes.

Q.    When you did so, did you have any hope that there would be anything found, given how clean the car had been?

A.    Not really.

MR. SNYDER:  Nothing further.

REDIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Colyer, --

A.    Yes.

Q.    -- you're not a forensic expert, are you?

A.    No.  I'm not.

Q.    Are you aware of some of the procedures that they use in -- when they test cars for certain type evidence?

A.    I really have not -- I'm no expert in that field. No. I'm not.

Q.    So you're not aware that even if the car was wiped down, if blood had been in there, they got advanced

W A C O   P O L I C E   D E P A R T M E N T                    SUPPLEMENT
                        WACO, TEXAS                            Report
=====================================================================
Reported Date: 11/08/01  Time: 15:15        Case: 01-074130 (004)  Page: 1
Code: 580000 NO          Crime: INFO ONLY    Class: 580000
Occurrence Date: 11/08/01-        Day: THURSDAY -              Time: 15:15-
Status: CL  CLOSED               Closing Officer: 000740 SPECIAL CRIME
Location: 1034 DELANO, WA                                 RD:   104
         ESTELLA MAXEY APT. COMPLEX
====================== NARRATIVE =====================================
On 11/14/01 I was contacted by ID TECH SANDERS. He told me a car driven by
Sheriff's Department being a RED PONTIAC GRAND AM 2 DR, bearing TX LP#
F02KRT was brought down to the laser lab to be processed. I was told DET.
JANUARY was handling a missing person case in which he suspected foul
play. A request was made to attempt to find blood inside the vehicle.

On first examining the vehicle, the crime scope was used at setting 475.
Both the trunk area and the inside of the vehicle were viewed through the
crime scope. Some dull staining could be seen on the back left floor board
behind the driver's seat. I tested this one stain with TMB solution and I
did not get an immediate reaction indicating this was blood. However, this
piece of carpet will be taken and placed as evidence.

After viewing the entire inside of the vehicle for possible blood stains,
it was then fingerprinted. A total of 15 print cards were obtained. Print
cards numbered 1 through 11 will be given to JOANN GUERCIO in fingerprints
to view these prints and see if any of them are of AFIS quality or can be
matched to the suspect. Prints #12 through 15 will be attached to the
laser request form. These prints show very little ridge detail that I could
see that could be used to make an identification.

A trace lift was done of the front passenger's seat, the driver's seat and
the rear seat. Also, a vacuum was done of all the floor mats and also the
trunk carpet was taken for possible trace evidence. The following items
that will be placed in the property room will be:
         ONE PIECE OF CARPET FROM THE BACK LEFT FLOOR BOARD
         THREE TRACE LIFTS
         ONE VACUUM CANISTER WITH TRACE EVIDENCE FIBER
         ONE SACK CONTAINING CARPET FROM THE TRUNK AREA OF THIS PONTIAC

35 mm photographs were taken of the outside and the inside of the vehicle.
This 35 mm film will also be turned in to the photo lab for processing if
needed at a later date.

=====================================================================
 A C O   Police Department                                First Page
=====================================================================
Reporting Officer: BLAIR J      Number: 000179  Date: 11/15/01  Time: 09:00
         Typed by: BROUSSARD    Number: 384     Date: 11/16/01  Time: 16:25
Approving Officer: BROUSSARD    Number: 000384  Date: 11/16/01  Time: 16:35

```
================================================================================
                W A C O   POLICE  DEPARTMENT                    SUPPLEMENT
                      WACO, TEXAS                               Report
  orted Date: 11/08/01   Time: 15:15          Case: 01-074130 (002)  Page: 1
Code: 580000 NO          Crime: INFO ONLY     Class: 580000
Occurrence Date: 11/08/01-          Day: THURSDAY -              Time: 15:15-
Status: CL  CLOSED              Closing Officer: 000740 SPECIAL CRIME
Location: 1034 DELANO, WA                                       RD:  104
        ESTELLA MAXEY APT. COMPLEX
======================== NARRATIVE ============================================
```

On 11-15-01 I received eleven latent fingerprint cards from Laser lab
Detective Blair. On these cards there are twelve latent lifts. I find
sufficient quality of print for AFIS submission. Prints are of very good
eye comparison quality.  Fingerprints remain on file in the AFIS Lab
until needed.

```
================================================================================
 C O   Police Department                                       First Page
================================================================================
 rting Officer: GUERCIO        Number: 000361   Date: 11/16/01  Time: 10:45
     Typed by: GUERCIO         Number: 361      Date: 11/16/01  Time: 10:43
 ving Officer: MCELYEA M       Number: 000387   Date: 11/17/01  Time: 14:49
```

```
==========================================================================
            W A C O   POLICE   DEPARTMENT                    SUPPLEMENT
                    WACO, TEXAS                                Report
==========================================================================
Reported Date: 11/08/01  Time: 15:15
Code: 580000 NO        Crime: INFO ONLY      Case: 01-074130 (005)  Page: 1
Occurrence Date: 11/08/01-                    Class: 580000
Status: CL CLOSED                  Day: THURSDAY                 Time: 15:15
Location: 1034 DELANO, WA         Closing Officer: 000740 SPECIAL CRIME
          ESTELLA MAXEY APT. COMPLEX                         RD:  104
===================== NARRATIVE ==========================================
```

On 11-15-01 after moving this red PONTIAC 2DR and releasing it to MCLENNAN COUNTY SO, it was found that a large amount of dirt had fallen from inside the fender wells of this PONTIAC, bearing TX plate F02KRT. A dirt sample was taken and will be placed in the property room, along with the other evidence.

```
==========================================================================
 C O   Police Department
==========================================================================
                                                            First Page
                                         ==============================
Reporting Officer: BLAIR J       Number: 000179  Date: 11/15/01  Time: 11:00
       Typed by: MAUER           Number: 365     Date: 11/16/01  Time: 16:43
Approving Officer: MAUER         Number: 000365  Date: 11/16/01  Time: 16:45
```

1917

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

UNITED STATES OF AMERICA    *
                            *
                            *
VS.                         * CRIMINAL ACTION NO. W-01-CR-164
                            *
SHERMAN LAMONT FIELDS       *    January 29, 2004

BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
                    TRIAL PROCEEDINGS
                      VOLUME 13

APPEARANCES:

For the Government:         Greg Gloff, Esq.
                            Steven Lloyd Snyder, Esq.
                            Assistant United States Attorneys
                            PO Box 828
                            Waco, Texas   76701

For the Defendant:          Pro Se

Standby Counsel:            J. Scott Peterson, Esq.
                            1701 Austin Avenue
                            Waco, Texas   76701
                            - and -
                            Robert T. Swanton, Jr., Esq.
                            Norwest Plaza
                            1105 Wooded Acres, Suite 630
                            Waco, Texas   76710

Court Reporter:             Kristie M. Davis
                            United States District Court
                            PO Box 20994
                            Waco, Texas   76702-0994

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

1992

(Jury instructions were further read by the Court).

THE COURT: The last two pages of the charge, ladies and gentlemen, I'll read to you after the final summations have been made, as those deal with the manner in which you should go about your deliberations.

Mr. Gloff, whenever you're ready.

OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT

MR. GLOFF: Ladies and gentlemen, this is -- this is not a game. It's not TV. It's not an event. This is real life. And the reason we're here is because this defendant killed, murdered Suncerey Coleman. That's why we're here. And we're here because the defendant wanted to control Ms. Coleman. And because the defendant wanted to control and have the ultimate act of control over Ms. Coleman, there's a mother who doesn't have a daughter anymore. And there's a sister that doesn't have a sister anymore, and there's three kids that don't have a mother anymore. And that's why we're here.

So what did the government have to prove to you and what did the government prove to you? Now, I want you to understand what I'm saying. Every charge in this indictment that the government brought forth I submit to you has been proven. I also submit to you that it's an important charge. But I'm going to sit here and look you in the eye and say the most important count and the most important charge in this indictment is Count Three. It's the murder charge, but I want

1995

violating the law of escape. That's why it's a continuing offense because of the continuing danger that an escapee poses to people. So that's Count One.

Count Two is simply the conspiracy to violate the law, and remember the Judge said -- and all a conspiracy is, folks, is it's an agreement between two or more people to do something illegal. That's all conspiracy means. It's just that simple. Count Two is the escape itself. And like I said and like you've heard, Mr. Fields is not contesting the fact that he escaped. You're either there or you're not and he wasn't there.

Count Four is the carjacking count. Ladies and gentlemen, did the government prove to you that the defendant on a morning at Hillcrest Hospital walked up to Tammy Edwards, grabbed her by the throat, pulled up a gun at her, didn't say, "Give me the keys." He said, "Get back in the car." She was one of the lucky ones. She saw it coming and she was able to fight him off. And she positively identified the defendant as stealing her car, taking her car. We proved to you that he took the car.

We put Joe Hunter on the stand to testify as to that car that it moved in interstate commerce, which is an element we have to prove. It was made in Canada. So it had to travel across state lines, national boundaries, if you will.

Did he intend to do her serious bodily harm or injury?

1996

What else would you call it if you grab a helpless person by the throat and pull a gun, trying to put a gun and say, "Get in the car"? What else are you going to call it?

How else do you know that the defendant is the one that carjacked her? Because when he was arrested at Tiemika Simmons' apartment on November the 24th, the keys to her car, to Tammy Edwards' car, were there. And you heard how the officer found the keys, gave it to Detective January. He went out, found the car and started the car. We proved the carjacking case to you.

Count Five has to do simply with his use of that gun during that episode of carjacking, The Judge instructed you that carjacking is a violent crime. And when he used that gun in that violent crime to further that crime to make sure she gave him the keys. Thank goodness she didn't get in the car. That's what Count Five is.

Count Six is the felon in possession. Did we prove that to you? When he was arrested on November the 24th in that apartment, what did Parnell McNamara say to you that he said? He gave him his Miranda warnings. And he said, "Do you have any firearms with you?" "Yeah. I've got a 22-caliber in the apartment under the rug." The defendant told him where it was. Tiemika Simmons said she'd seen him with a gun the day before when he was over there. So what happens? Bubba Colyer goes in. He finds the gun where the defendant said it was going to

1997

be. What was it? A 22-caliber just like the defendant said. And there was even DNA evidence on the gun that pointed to the defendant. We also had to prove to you through the testimony of Doug Kunze that that gun traveled in interstate commerce. It was manufactured in Connecticut, traveled to Texas. That satisfies that element. Also we had to prove to you that the defendant knowingly possessed it. I submit to you that the evidence is overwhelming in the case that he possessed that gun.

Now, the last count, Count Seven, has to do with him possessing that .22 during his crime of escape. Just like possessing the gun, using a gun during the carjacking, he possessed and used the .22 to further his crime of escape. How did he do that? He was on the run. When you're on the run and you're an escaped convict and you're looking not to get caught, your tool of the trade is going to be your gun, and that's what he was doing. He had that gun for his protection. If he needed to shoot somebody, if he needed to rob somebody, if he needed to steal from somebody, that's why he had that gun.

Now, I want to go to Count Three. Mr. Snyder told you on Monday that the evidence would tell a story. And at first you may think, well, the story started on November 6th, 2001. That's what the government's been saying over and over, but I want to tell you it started a little bit before that. It started when the defendant had a relationship with Suncerey

1998

Coleman and Shalaykea Scroggins. And part of the defendant's interest was controlling those women. He wanted to control Suncerey Coleman, the victim in this case, and he was having trouble. Why? Because he was in jail and he couldn't keep tabs on her. How do we know that that's what was in his mind that he wanted to control her? Because you have November the 1st to November the 6th, 200 phone calls from the jailhouse cell that the defendant was making to her. "Where are you?" "What's going on?" "What are you doing?" "Who are you going with?" Control.

How do we know what was on his mind when he got ready to escape? You heard Quigley and Tubbs testify they heard him on the phone. I guess so if there's over 200 phone calls in a six-day period. They had heard him on the phone fighting with her. They had heard the defendant talking to her saying, "If you're with somebody else, I'm going to kill you. I'm going to smoke you. I'm going to spray you." Trying to control, trying to keep the grasp, trying to control what she was doing.

When he was sitting in that jail cell and he was planning on how to talk Benny Garrett into giving him a key for the promise of $5,000 so he could get out, he was thinking about what he was going to do to Suncerey Coleman and Shalaykea Scroggins, as well. Do you know what you call that? You call that premeditation. You call it sitting around planning what you're going to do when you get your chance.

1999

What did he do?  He escapes on November the 6th.  He's a free man.  What would you think most free men after being in jail locked up all that time -- he didn't want a pizza.  He didn't want to get a bus ticket out of town.  He didn't want to go and just have some good food somewhere.  He wanted a gun and a car.  That's what he wanted.  So he gets a gun, a 32-caliber from his buddy Trey Boy and he gets a car.

What's one of the next things that he does in this?  At 8:00 o'clock he calls Hillcrest Hospital and he talks to Suncerey Coleman.  Do you know what you call that?  Getting the gun, getting the car, making the phone call?  You call that premeditation.  Then he gets in the car and he drives over to Hillcrest Hospital and he sees her.  And do you remember the testimony of Tanesha Hilliard?  He wasn't acting mad.  He wasn't in a rage.

Do you remember Quigley or Tubbs when they said that Mr. Fields liked to say "The mouthpiece is a masterpiece?"  When he showed up at the hospital, the mouthpiece was the masterpiece.  It's okay.  Everything's fine.  Hugging and kissing, putting her off, controlling her with the fact that he was acting as if everything was okay.

So what did he do next?  Everything's fine.  I've got to go do a few things.  I'll see you later.  What's the next thing he goes and does?  He goes and picks up Laykea.  Shalaykea Scroggins.  Takes her out to the country.  You heard her

2000

testify that he told her, "I was going to kill you, too." Do you know what you call that? Premeditation.

He decides not to kill her. He brings her back. They want to meet up with Trey Boy and his girlfriend, but he needs a place at New Road Inn. How do we know that those events took place? Because you heard the testimony about how she stopped -- they stopped and she called to check on whether or not they had the room from the pay phone out in Downsville not too far from where Ms. Coleman's body was found. And then she made another phone call at the pay phone at New Road Inn.

Then they all meet up at the motel. They talk a little bit. Edward Lee Outley, Trey Boy, told you he gave him the gun, the 32-caliber. He described it to you. The 32-caliber. Do you know what you call that when he got that gun? That's called premeditation. Laykea says she saw the gun. He was playing with the bullets saying, "One of these bullets has your name on it." He's got it at the motel with him.

So they leave and get separated and then he's unaccounted for for the next few hours. Do we know what he did in the next few minutes? No. Do we know how many different cars he was in during that time? No. But we do know this: He went back to the hospital. Do you know what you call that? You call that premeditation.

And he went up to the room and you have two witnesses, Tanesha Hilliard and Nathan Lloyd, who both saw him. And he

2001

goes in the room and he makes that statement about the baby's father. He looks at the cell phone and he says, "I need to talk to you. It's okay. I just need to talk to you."

And do you remember what Tanesha Hilliard said when we asked her the question, did she ever -- "Did she leave with him?" "Yeah. She left with him. I followed down and got my money."

"Did you see what kind of car they were in?" "No. I didn't see what kind of car they were in."

"Did you ever see her alive again?" "No."

"Did she ever come back for her baby?" "No."

He was the last one with her.

So what happened next? How do we know what happened next? Because the testimony of the witnesses of what the defendant told them. Why did he tell all these people this? You know, it's not reasonable that he would say all these things to anybody. It is if that's the way that you control people. If you want people to be scared of you and fear you or think that you do these things and you're not to be messed with, then you tell people. You also tell your friends and your close associates that you're involved with.

Do you know what he was doing when he went up there and he picked her up the second time? That's called premeditation.

Do you know what you call it -- and make no mistake about it. The government, nobody knows which route he took out to

2002

Downsville to that lonely country road, but I'll tell you this much. I submit to you that whether it took him 18 minutes to go out there or it took him 24 minutes to go out there, every single minute he's driving her out there to meet her fate is premeditation. He planned the whole thing.

So what happens when he gets out there? Well, you heard from several witnesses, and I want to point out a couple things. If Homero DeLeon was lying about what he was testifying about, about what the defendant told him, how did he know the people who had testified in the grand jury when the only people that knew that were the people at this table, the people at that table? How did he know that? Unless the defendant told him.

I want you to think about something else. How did Jerry Keith Reed who says that he met Sherman Fields up in Fort Worth in January of '03, how did he on March the 10th of '03, when he talked to investigators, how did he know what Sherman Fields was going to say on January the 26th of 2004, Monday morning when he came in here and in his opening statement he said Laykea and Trey Boy killed that girl, not me. How did Jerry Keith Reed know that last March? Unless he talked to the defendant.

I want you to focus on Christian Chae Walker. When he testified, I submit to you that it was a little chilling. The reason it was chilling, it was because the description was so

## II. PART TWO - STATUTORY AGGRAVATING FACTORS

**Instructions**: For each of the following, answer "YES" if you, the jury, unanimously find that the government has established the existence of that statutory aggravating factor **beyond a reasonable doubt**; answer "NO" if you do not so find:

(A)  The defendant, Sherman Lamont Fields, committed the offense after substantial planning and premeditation to cause the death of the victim, Suncerey Coleman.

Unanimously       YES  _____

NO  ___✓___

(B)  The death, or the injury resulting in death, of the victim, Suncerey Coleman, occurred during the commission or attempted commission of an offense, that is, escape.

Unanimously       YES  ___✓___

NO  _____

(C)  The defendant, Sherman Lamont Fields, has previously been convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or the attempted or threatened use of a firearm against another person.

Unanimously       YES  ___✓___

NO  _____

4

FILED

JAN 3 0 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA        §
                                §
vs.                             §        CRIMINAL ACTION W-01-CR-164
                                §
SHERMAN LAMONT FIELDS, (01)     §
                                §

JURY NOTE NUMBER ___4___

*Request the testimony (or evidence, if it is available) of the results of DNA testing on the car. A summary of ~~what~~ the testing and results is acceptable.*

*Tom Michaelis*
PRESIDING JUROR

*1/30/04*               *1540 hours*
DATE and TIME

* * * * * * * * * *

COURT'S RESPONSE:

See Attachment

_____

WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

_____
DATE and TIME

179

443

**Attachment**

As I instructed right after you were sworn:

> Under normal circumstances, no written testimony of witnesses can be made available to you during your deliberations; nor, under normal circumstances, can all of any significant portion of a witness's testimony be read to you during your deliberations.

When a jury requests a specific question about a portion of a particular witness's testimony, then that can often be provided. It is, however, quite time consuming. First, the parties and I have to listen to the tape of that testimony, and determine which portion would answer your questions, and then the Court Reporter has to transcribe it. This can take several hours.

I cannot answer the type of question you have asked. However, if you have a specific question about a particular witness's testimony, please send me another note. If not, please continue your deliberations.

_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

1/30/04          4:12 p.m.
DATE AND TIME

- Claim: Jail-house informants gave false testimony. Adjudicated by: Order denying § 2255 relief, Appendix A, p. 65 (rejecting actual innocence claim).

Moreover, on direct appeal, Fields did not challenge the sufficiency of the evidence against him. *See Fields*, 483 F.3d at 347–62 (discussing alleged trial court errors). Therefore, many of the issues he now raises are procedurally barred.

The only claims Fields has not previously raised appear to be (1) that the trial judge was somehow biased because of his relationship with an attorney who represented the Coleman family in a civil suit against the company providing security at the McClennan County Detention Center and (2) that the government failed to disclose photographs of the Grand Am. (*Pro se* Petition at 7, 16). Neither of these claims suggest § 2255 is an inadequate remedy. The civil suit was a public record at the time of Fields's trial and the existence of undisclosed "photographs" is conjecture based on a motion for discovery filed prior to trial. Nothing in the record suggests "undisclosed" photographs exist. As such, Fields cannot show that he is entitled to relief under § 2241, and this court should dismiss his petition.

**B. This court should reject Fields's claims relating to his previous *pro se* filings.**

Fields claims several issues remain "unadjudicated" because the Fifth Circuit Court of Appeals did not consider his *pro se* filings. (*Pro se* petition at 1). Specifically, he claims the following issues were never decided by a court: "Judicial Bias issues," "brady violations," "Actual Innocence claim," "criminal act(s) perpetrated against Fields by the prosecution," "The Criminal Act of Fraud On the Court(s)," "Fields' conviction and

15

# U.S. District Court
## Southern District of Indiana (Terre Haute)
### CIVIL DOCKET FOR CASE #: 2:16-cv-00418-JMS-MJD

FIELDS v. WARDEN                              Date Filed: 10/26/2016
Assigned to: Judge Jane Magnus-Stinson        Jury Demand: None
Referred to: Magistrate Judge Mark J. Dinsmore  Nature of Suit: 535 Death Penalty - Habeas
Cause: 28:2241 Petition for Writ of Habeas Corpus (federal)   Corpus
                                             Jurisdiction: U.S. Government Defendant

**Petitioner**

**SHERMAN LAMONT FIELDS**    represented by   **Jeffrey E. Ellis**
                                             LAW OFFICE OF ALSEPT & ELLIS
                                             621 SW Morrison St., Ste 1025
                                             Portland, OR 97205
                                             503-222-9830
                                             Email: jeffreyerwinellis@gmail.com
                                             *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**WARDEN**                   represented by   **James Robert Wood**
*USP TERRE HAUTE*                            UNITED STATES ATTORNEY'S
                                             OFFICE
                                             10 West Market Street
                                             Suite 2100
                                             Indianapolis, IN 46204
                                             (317) 229-2462
                                             Fax: (317) 226-6125
                                             Email: bob.wood@usdoj.gov
                                             *ATTORNEY TO BE NOTICED*

                                             **Zachary Carl Richter**
                                             UNITED STATES ATTORNEY'S
                                             OFFICE
                                             816 Congress Ave.
                                             Suite 1000
                                             Austin, TX 78701
                                             512-916-5858
                                             Fax: 512-916-5854
                                             Email: zachary.c.richter@usdoj.gov
                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/26/2016 | 1 | PETITION for Writ of Habeas Corpus, filed by SHERMAN LAMONT FIELDS. (No fee paid with this filing) (DJH) (Additional attachment(s) added on 10/28/2016: # 1 Exhibit 1 letter, # 2 Exhibit 2 Western District of Texas order, # 3 Exhibit 3 Motion to Proceed Pro Se, # 4 Exhibit 4 letter from Court of Appeals, # 5 Exhibit 5 Freestanding Actual Innocence Brief, # 6 Exhibit 6 Motion to Seal Brief, # 7 Exhibit 7 Motion to Bar, # 8 Exhibit 8 Post Conviction Motion, # 9 Exhibit 9 Response to Pro Se Motion, # 10 Exhibit 10 Order from Court of Appeals, # 11 Exhibit 11 letter from Court of Appeals, # 12 Exhibit 12 letter from Court of Appeals, # 13 Exhibit 13 letter from Court of Appeals, # 14 Exhibit 14 Motion for Reconsideration, # 15 Exhibit 15 Motion to Reurge Filings) (DJH). (Additional attachment(s) added on 10/28/2016: # 16 Exhibit 16 letters from Court of Appeals, # 17 Exhibit 17 Motion Appealing Order from the Fifth Circuit, and Motion to United States Supreme Court, # 18 Exhibit 18 Motion Pursuant to Rule 60, # 19 Exhibit 19 letter from US Supreme Court, # 20 Exhibit 20 letter to Clerk, # 21 Exhibit 21 Page Nos. 51-55 from court document, # 22 Exhibit 22 Judgment from DC Circuit Court of Appeals, # 23 Exhibit 23 page of transcript for voir dire examination, # 24 Exhibit 24 pages of transcript, # 25 Exhibit 25 Examination of Ms. Scroggins by Mr. Fields, # 26 Exhibit 26 Shalaykea Scroggins Grand Jury testimony, # 27 Exhibit 27 Statement of Shalaykea Scroggins, # 28 Exhibit 28 Direct Examination of Edward Outley by Mr. Snyder, # 29 Exhibit 29 Cross-Examination at Shaylakea Scroggins by Mr. Fields, # 30 Exhibit 30 Douglas Kunze Grand Jury testimony) (DJH). (Additional attachment(s) added on 10/28/2016: # 31 Exhibit 31 Motion to Recuse the Hon. Edith Jones, # 32 Exhibit 32 Page 56 of court document, # 33 Exhibit 33 letters, # 34 Exhibit 34 pages of transcript, # 35 Exhibit 35 Cross Examination of Shaylakea Scroggins by Mr. Fields, # 36 Exhibit 36 Direct Examination of James Blair by Mr. Fields, # 37 Exhibit 37 Police Report, # 38 Exhibit 38 Cross-Examination of Steve January, # 39 Exhibit 39 letters, # 40 Exhibit 40 Officer Warning Statement, # 41 Exhibit 41 Cross-Examination by Christian Walker by Mr. Fields, # 42 Exhibit 42 Direct Examination of Edward Outley by Mr. Snyder, # 43 Exhibit 43 Page of Transcript, # 44 Exhibit 44 Re-Cross Examination of Edward Outley by Mr. Fields, # 45 Exhibit 45 Cross-Examination of Edward Outley by Mr. Fields, # 46 Exhibit 46 letter from Edward Lee Outley III "TreyBoy", # 47 Exhibit 47 Cross-Examination of Edward Outley by Mr. Fields, # 48 Exhibit 48 Motion for Discovery, Production, and Inspection of Evidence filed in Western District of Texas, # 49 Exhibit 49 Request by juror filed in Western District of Texas, # 50 Exhibit 50 judge response to juror request) (DJH). (Additional attachment(s) added on 10/28/2016: # 51 Exhibit 51 Johnny Spillman grand jury testimony, # 52 Exhibit 52 Chris Casson grand jury testimony, # 53 Exhibit 53 Cross-Examination of Tanesha Hilliard by Mr. Fields, # 54 Exhibit 54 Sheriff's Office follow-up report, # 55 Exhibit 55 Cross-Examination of Shaylakea Scroggins by Mr. Fields, # 56 Exhibit 56 Direct Examination of Lutrill Payne by Mr. Fields, # 57 Exhibit 57 Report of Investigation, # 58 Exhibit 58 letter from attorney, # 59 Exhibit 59 Direct Examination of Chance Alexander, # 60 Exhibit 60 Direct Examination of Edward Outley by Mr. Snyder, # 61 Exhibit 61 Interview conduct via telephone, # 62 Exhibit 62 Cross-Examination of William Young by Mr. Gloff, # 63 Exhibit 63 Cross-Examination of Douglas Kunze by Mr. Gloff, # 64 Exhibit 64 Direct |

Examination of William Young by Mr. Fields, # 65 Exhibit 65 Cross-Examination of Edward Outley by Mr. Fields, # 66 Exhibit 66 Statement of Danny Edwards, # 67 Exhibit 67 Tammy Edwards deposition, # 68 Exhibit 68 Tammy Edwards deposition, # 69 Exhibit 69 Direct Examination of Steve January by Mr. Snyder, # 70 Exhibit 70 police report, # 71 Exhibit 71 police report narrative, # 72 Exhibit 72 Statement of Christian Walker) (DJH). (Additional attachment(s) added on 10/28/2016: # 73 Exhibit 73 Statement of Christian Walker, # 74 Exhibit 74 Government's Motion for Downward Departure filed in Western District of Texas, # 75 Exhibit 75 Cross-Examination of Christian Walker by Mr. Fields, # 76 Exhibit 76 Chris Walker's grand jury testimony, # 77 Exhibit 77 letter to US Attorney from Homero DeLeon, # 78 Exhibit 78 Direct Examination of Homero DeLeon by Mr. Snyder, # 79 Exhibit 79 Cross Examination of Homero DeLeon by Fields, # 80 Exhibit 80 Report of Investigation, # 81 Exhibit 81 Direct Examination of Douglas Kunze by Mr. Gloff, # 82 Exhibit 82 letter from attorney Scott Peterson, # 83 Exhibit 83 Direct Examination of Parnell McNamara by Mr. Gloff, # 84 Exhibit 84 Hubert Steadman's grand jury testimony, # 85 Exhibit 85 Sheriff's Office follow-up report, # 86 Exhibit 86 jury findings on Statutory Aggravating Factors, # 87 Exhibit 87 page from court document, # 88 Envelope) (DJH). (Entered: 10/27/2016)

| 10/26/2016 | 2 | MOTION for Leave to Proceed in forma pauperis, filed by Petitioner SHERMAN LAMONT FIELDS. (DJH) (Additional attachment(s) added on 10/28/2016: # 1 Envelope) (DJH). (Entered: 10/27/2016) |
|---|---|---|
| 10/26/2016 | 3 | MOTION for Writ of Conspiracy/Writ of Error Coram Nobis filed by Petitioner SHERMAN LAMONT FIELDS. (DJH) (Additional attachment(s) added on 10/28/2016: # 1 Envelope) (DJH). (Entered: 10/27/2016) |
| 10/27/2016 | 4 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (DJH) (Entered: 10/27/2016) |
| 11/29/2016 | 5 | Entry Concerning Selected Matters: The petitioner's custodian is the sole proper respondent and is now substituted for the official originally designated as respondent. 2.The request to proceed in forma pauperis [dkt 2 ] is granted. Copy sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on 11/29/2016. (DW) (Entered: 11/29/2016) |
| 12/07/2016 | 6 | Correspondence REQUESTING COPY of Case Docket Sheet, filed by Petitioner. Copy/Copies provided via US Mail. (Attachments: # 1 Copy of Docket Sheet, # 2 Envelope) (DW) (Entered: 12/08/2016) |
| 01/25/2017 | 7 | MOTION for deadlines, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Envelope)(DW) (Entered: 01/26/2017) |
| 02/06/2017 | 8 | Entry Concerning Selected Matters - Therefore, his motion for a writ of conspiracy/writ of error coram nobis is premature. Being premature, the motion [dkt 3 ] is denied without prejudice. 2.A copy of the docket sheet shall be included with the petitioner's copy of this Entry. 3.An Order to Show Cause is being issued concurrent with this Entry. The petitioner's motion for deadlines is therefore denied as moot (SEE ENTRY). Copy sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on 2/6/2017. (DW) (Entered: 02/06/2017) |

| | | |
|---|---|---|
| 02/06/2017 | 9 | ENTRY and ORDER TO SHOW CAUSE - The respondent shall have through April 18, 2017 in which to answer the allegations of the habeas petition, and in doing so shall show cause why the relief sought by the petitioner should not be granted. The petitioner shall have thirty (30) days after service of the answer in which to reply (SEE ENTRY). Copy sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on 2/6/2017.(DW) (Entered: 02/06/2017) |
| 04/04/2017 | 10 | NOTICE of Appearance and Motion for Extension of Time to Amend Petition by Jeffrey E. Ellis on behalf of Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) Modified on 4/5/2017 (DW). (Entered: 04/04/2017) |
| 04/06/2017 | 11 | ORDER granting 10 Motion for Extension of Time. The petitioner shall have through April 28, 2017 in which to file an amended petition for writ of habeas corpus. Signed by Judge Jane Magnus-Stinson on 4/6/2017. (DW) (Entered: 04/06/2017) |
| 04/07/2017 | 12 | NOTICE of Appearance by James Robert Wood on behalf of Respondent WARDEN. (Wood, James) (Entered: 04/07/2017) |
| 04/14/2017 | 13 | MOTION for Extension of Time to *FILE RESPONSE TO ANTICIPATED AMENDED PETITION FOR WRIT OF HABEAS CORPUS*, filed by Respondent WARDEN. (Attachments: # 1 Text of Proposed Order)(Wood, James) (Entered: 04/14/2017) |
| 04/18/2017 | 14 | ORDER granting 13 Motion for Extension of Time. The Respondent shall have thirty (30) days after the filing of the Petitioner's Amended Petition for Writ of Habeas Corpus to file his response to the amended petition. Signed by Judge Jane Magnus-Stinson on 4/18/2017. (DW) (Entered: 04/18/2017) |
| 04/19/2017 | 15 | NOTICE of intent to respond, filed by Petitioner SHERMAN LAMONT FIELDS (Attachments: # 1 Envelope) (DW) (Entered: 04/20/2017) |
| 04/26/2017 | 16 | AMENDED COMPLAINT *Petition for Writ of Habeas Corpus* against WARDEN, filed by SHERMAN LAMONT FIELDS. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Ellis, Jeffrey) (Entered: 04/26/2017) |
| 05/11/2017 | 17 | NOTICE OF EX PARTE TELEPHONIC CONFERENCE - A telephonic conference will be conducted on May 30, 2017 at 2:00 p.m., Eastern Time. Participants shall call 317-229-3670, from which they will be connected to the conference (SEE NOTICE). Signed by Judge Jane Magnus-Stinson on 5/11/2017.(DW) (Entered: 05/11/2017) |
| 05/16/2017 | 18 | ORDER TO MAKE PETITIONER AVAILABLE TO PARTICIPATE IN EX PARTE TELEPHONIC CONFERENCE - To: Warden (c/o Counselor Andrew Sutton) United States Penitentiary - Terre Haute. A telephonic conference has been set for May 30, 2017 at 2:00 o'clock p.m., Eastern Time. The petitioner will participate in the conference. You or your designee(s) are ORDERED to make Sherman Fields available to participate in the conference just described and to place a call to the Court at 317-229-3670 at the time set for the conference. (See Order.) Signed by Honorable Judge Jane Magnus Stinson on 5/16/2017.(RSF) Modified on 5/16/2017 (RSF). (Entered: 05/16/2017) |
| 05/17/2017 | 19 | NOTICE of Appearance by Jennifer Freel on behalf of Respondent WARDEN. (Freel, Jennifer) (Entered: 05/17/2017) |

Case: 18-3389    Document: 1-1     Filed: 11/07/2018     Pages: 102

| | | |
|---|---|---|
| 05/18/2017 | 20 | Submission of Signature Requirement re 19 Notice of Appearance by WARDEN. (Freel, Jennifer) (Entered: 05/18/2017) |
| 05/26/2017 | 21 | ANSWER to 16 Amended Complaint, 1 Petition for Writ of Habeas Corpus , RESPONSE to 16 Amended Complaint, 1 Petition for Writ of Habeas Corpus , filed by LORETTA LYNCH, WARDEN. (Attachments: # 1 Appendix A: District Court Order Denying 2255 Relief, # 2 Appendix B: Docket Sheet, # 3 Appendix C: Letter to District Court, # 4 Appendix D: Motion to Proceed Pro Se, # 5 Appendix E: Response to Pro Se Motion, # 6 Appendix F: Order Denying Pro Se Motion, # 7 Appendix G: Response to Notice, # 8 Appendix H: Motion for Reconsideration, # 9 Appendix I: Order Denying Motion to Reconsider)(Freel, Jennifer) (Entered: 05/26/2017) |
| 05/31/2017 | 22 | MINUTE ENTRY for proceedings held before Judge Jane Magnus-Stinson: A telephonic conference was conducted on May 30, 2017. The petitioner participated in person and his counsel of record also participated. As previously determined, the conference was ex parte and in camera. The court reporter was Jean Knepley. The representation of counsel of record for the petitioner shall continue. The petitioner's request that his desire to have the opportunity to submit a pro se supplemental brief dkt 15 is granted in part. The petitioner shall have through July 20, 2017 in which to submit the combined reply to the respondent's answer to the amended petition for writ of habeas corpus, mislabeled in docket item 21 as answer to amended complaint. (See Entry.) Signed by Judge Jane Magnus-Stinson. (Court Reporter Jean Knepley.)(RSF) (Entered: 06/01/2017) |
| 05/31/2017 | 23 | ***STRICKEN PER 24 ENTRY and NOTICE*** Submission of Letter Regarding Claims, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Envelope)(APD) Modified on 6/8/2017 (DW). (Entered: 06/01/2017) |
| 06/08/2017 | 24 | ENTRY AND NOTICE - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Mr. Fields' pro se filing of May 31, 2017 is stricken and shall be returned to his counsel of record with a copy of this Entry. Copy of filing and Entry sent to Attorney Jeffrey E. Ellis. Signed by Judge Jane Magnus-Stinson on 6/8/2017.(DW) (Entered: 06/08/2017) |
| 07/17/2017 | 25 | REPLY in Support of Motion re 3 MOTION for Writ , filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 07/17/2017) |
| 07/20/2017 | 26 | ENTRY Discussing Pro Se Submission - The Court received a pro se submission directly from the petitioner in this action even though he is represented by counsel. The Court previously stated that "[t]he petitioner shall not file material directly with the Court and material received directly from the petitioner, if submitted, shall be returned unfiled." Filing No. 22 at 2. Accordingly, the clerk is directed to return the petitioner's submission to him unfiled. Copy of Entry and material sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on 7/20/2017.(DW) (Entered: 07/20/2017) |
| 08/24/2017 | 27 | MOTION *for Immediate Relief*, filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 08/24/2017) |
| 08/25/2017 | 28 | ENTRY Directing Briefing Schedule - Presently before the Court is the petitioner's Motion for Immediate Release. The respondent have through September 8, 2017, in which to file a response brief. The petitioner shall have through September 15, 2017, in |

| | | |
|---|---|---|
| | | which to file a reply brief. Signed by Judge Jane Magnus-Stinson on 8/25/2017.(DW) (Entered: 08/25/2017) |
| 09/01/2017 | 29 | RESPONSE in Opposition re 27 MOTION *for Immediate Relief* . (Freel, Jennifer) (Entered: 09/01/2017) |
| 09/08/2017 | 30 | MOTION for Petitioner to Proceed prose again, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Envelope)(DW) (Entered: 09/11/2017) |
| 09/14/2017 | 31 | REPLY in Support of Motion re 27 MOTION *for Immediate Relief* , filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 09/14/2017) |
| 09/15/2017 | 32 | Entry and Notice - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Mr. Fields's pro se filing of September 8, 2017, dkt. 30 , is stricken and shall be returned to his counsel of record with a copy of this Entry. The clerk is directed to terminate this filing as a pending motion on the docket. Signed by Judge Jane Magnus-Stinson on 9/15/2017. (DW) (Entered: 09/15/2017) |
| 10/02/2017 | 33 | Entry Denying Motion for Immediate Relief and Directing Further Proceedings - The petitioner filed this habeas action pursuant to 28 U.S.C. § 2241 challenging his death sentence imposed after being convicted of violating 18 U.S.C. § 924(c) in the United States District Court for the Western District of Texas. Presently pending is the petitioner's motion for immediate relief in light of the Seventh Circuit's recent decision. The petitioner's motion for immediate relief, dkt. 27 , is denied. The petitioner must file a brief regarding how the Supreme Court's decision in Dimaya impacts the issue in this case by no later than twenty-eight days after Dimaya is decided. The respondent has fourteen days after the petitioner's brief is filed to file a response. (See Entry.) Signed by Judge Jane Magnus-Stinson on 10/2/2017. (RSF) (Entered: 10/02/2017) |
| 10/25/2017 | 34 | ***STRICKEN PER 35 ENTRY*** MOTION for Immediate Relief, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(DW) (Additional attachment(s) added on 10/26/2017: # 5 Envelope) (DW). Modified on 11/1/2017 (DW). Modified on 11/1/2017 (DW). (Entered: 10/26/2017) |
| 11/01/2017 | 35 | Entry and Notice - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Mr. Fields's pro se filing of October 25, 2017, dkt. 34 , is stricken and his counsel is hereby notified of its filing. The clerk is directed to terminate this filing as a pending motion on the docket. Signed by Judge Jane Magnus-Stinson on 11/1/2017. (DW) (Entered: 11/01/2017) |
| 11/02/2017 | 36 | NOTICE of Withdrawal of Appearance by *Jennifer Freel* on behalf of All Defendants (Freel, Jennifer) (Entered: 11/02/2017) |
| 12/13/2017 | 37 | MOTION to Appoint Counsel , filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 12/13/2017) |
| 12/21/2017 | 38 | ORDER granting 37 Motion to Appoint Counsel. It is hereby ordered that Jeffrey Ellis of the Law Office of Alsept & Ellis, LLC is appointed as counsel for Petitioner, Sherman L. Fields, in the above-entitled matter. Payment is authorized pursuant to the CJA plan. It is counsel's responsibility to provide necessary documents to the Court's |

|  |  | finance department in order establish a local account in Evoucher. Copy distributed pursuant to distribution list. Signed by Judge Jane Magnus-Stinson on 12/21/2017. (RSF) (Entered: 12/21/2017) |
|---|---|---|
| 12/21/2017 | 39 | NOTICE of Appearance by Zachary Carl Richter on behalf of Respondent WARDEN. (Richter, Zachary) (Entered: 12/21/2017) |
| 05/02/2018 | 40 | Unopposed MOTION for Extension of Time to 6/14/2018 in which to 33 Order on Motion *Re: Impact of Dimaya*, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Text of Proposed Order)(Ellis, Jeffrey) (Entered: 05/02/2018) |
| 05/03/2018 | 41 | ORDER granting 40 Motion for Extension of Time until June 14, 2018, to file his brief regarding the impact of Dimaya on this case. Respondent has fourteen days after the petitioner's brief is filed to file a response. Signed by Judge Jane Magnus-Stinson on 5/3/2018. (DW) (Entered: 05/03/2018) |
| 06/13/2018 | 42 | BRIEF/MEMORANDUM in Support *OF DEFENDANTS AMENDED PETITION FOR WRIT OF HABEAS CORPUS, REGARDING THE SUPREME COURTS HOLDING IN SESSIONS v. DIMAYA*, re 33 Order on Motion, filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 06/13/2018) |
| 06/18/2018 | 43 | Unopposed MOTION for Extension of Time to 8/6/18 in which to 42 Brief/Memorandum in Support , filed by Respondent WARDEN. (Attachments: # 1 Text of Proposed Order)(Richter, Zachary) (Entered: 06/18/2018) |
| 06/20/2018 | 44 | ORDER - For good cause shown, this Court grants Respondent an extension of time 43 until August 6, 2018, to file a response to Petitioner Sherman Fields's supplemental briefing on the effect of the decision in Sessions v. Dimaya, 138 S. Ct. 1204 (2018). Signed by Judge Jane Magnus-Stinson on 6/20/2018. (DW) (Entered: 06/20/2018) |
| 07/27/2018 | 48 | Unopposed MOTION for Extension of Time to 8/13/18 *for Supplemental Briefing*, filed by Respondent WARDEN. (Attachments: # 1 Text of Proposed Order)(Richter, Zachary) (Entered: 07/27/2018) |
| 08/02/2018 | 49 | ORDER GRANTING MOTION FOR EXTENSION OF TIME - This Court grants Respondent's motion for an extension of time, dkt. 48 , until August 13, 2018, to file a response to Petitioner Sherman Fields's supplemental briefing. (See Order.) Signed by Judge Jane Magnus-Stinson on 8/2/2018. (DMW) (Entered: 08/02/2018) |
| 08/13/2018 | 50 | BRIEF *Supplemental* on *Sessions v. Dimaya*, filed by Respondent WARDEN. (Richter, Zachary) Modified on 8/14/2018 (JD). (Entered: 08/13/2018) |
| 08/13/2018 | 51 | NOTICE of Filing *(Manual) of Attachment to Supplemental Brief* by WARDEN (Richter, Zachary) (Entered: 08/13/2018) |
| 08/14/2018 | 53 | Remark - One (1) DVD containing transcripts from the criminal trial re 51 NOTICE of Filing *(Manual) of Attachment to Supplemental Brief* by WARDEN (Richter, Zachary) (Attachments: # 1 Envelope) (DWH) (Entered: 08/15/2018) |
| 08/15/2018 | 52 | Unopposed MOTION to Stay *Proceedings*, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Text of Proposed Order)(Ellis, Jeffrey) (Entered: 08/15/2018) |

| 08/16/2018 | 54 | ORDER STAYING PROCEEDINGS - This Court orders a stay of these proceedings to allow the parties to attempt to reach an agreed resolution 52 . Mr. Fields shall file a report every 30 days regarding the status of negotiations. If either party reports that an agreed settlement cannot be reached, this Court shall dissolve the stay. Signed by Judge Jane Magnus-Stinson on 8/16/2018. (DWH) (Entered: 08/16/2018) |
| --- | --- | --- |
| 09/16/2018 | 55 | STATUS REPORT by SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 09/16/2018) |
| 09/17/2018 | 56 | CERTIFICATE OF SERVICE by SHERMAN LAMONT FIELDS re 55 Status Report (Ellis, Jeffrey) (Entered: 09/17/2018) |
| 10/11/2018 | 58 | Entry Striking Pro Se Filing - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Petitioner Sherman Field's pro se filing of October 9, 2018, dkt. 57 , is stricken. The clerk is directed to add an ex parte restriction to this filing. Signed by Judge Jane Magnus-Stinson on 10/11/2018. (DMW) (Entered: 10/11/2018) |
| 10/15/2018 | 59 | STATUS REPORT *(Second)* by SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 10/15/2018) |

**Case #: 2:16-cv-00418-JMS-MJD**

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 11/07/2018 16:12:59 | | |
| **PACER Login:** | US4852US:5699723:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:16-cv-00418-JMS-MJD |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |